**In re Michael R. SPARKS, Debtor.**

**Michael R. SPARKS, Plaintiff,**

v.

**Margaret B. SPARKS, Defendant.**

**Bankruptcy No. 92 B 21692.
Adversary No. 96 A 00568.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 24, 1997.

David P. Leibowitz and David Weininger, Chicago, IL, for Plaintiff.

James P. Wognum, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

The Debtor filed this adversary proceeding to determine whether his obligations to his estranged wife, Margaret Sparks, under an Antenuptial Agreement ("Agreement") were discharged by confirmation of his plan of reorganization. The Debtor has moved for summary judgment in his favor on the grounds that those obligations are not excepted from discharge by § 523(a)(5), but were discharged by confirmation of the plan. Mrs. Sparks asserted several defenses and one counterclaim to the complaint. In the counterclaim she alleged that the Agreement was an executory contract, and that since it had not been formally rejected, it was assumed by the Plan. Both parties have moved for summary judgment on that counterclaim. The Court finds that there is an issue of material fact under § 523(a)(5) and therefore denies the Debtor's motion. There is no such issue with respect to Mrs. Sparks' claim that the Agreement is an assumed executory contract (it is not), and judgment will be·

entered in the Debtor's favor on the counter-claim.

### Undisputed Facts [1]

The parties entered into the Agreement on Nov. 8, 1985. They were married on Nov. 9, 1985. On Dec. 19, 1991, Mrs. Sparks filed a proceeding to dissolve the marriage; that proceeding remains pending and unresolved. The Circuit Court of Cook County, by an order entered July 24, 1995, determined that the Agreement is valid. In its order the circuit court noted that the following issues remained unresolved: "the interpretation of the provision of the Agreement with respect to the division of the marital residence, the amount of monies remaining due to MARGA-RET for the lump sum settlement in lieu of maintenance and property rights pursuant to paragraph 11 of the Agreement and the amount of child support to be paid by MI-CHAEL, custody and visitation...." ¶5.

Mrs. Sparks claimed that she had an interest in the marital residence by reason of the Agreement. This Court determined, by order dated March 4, 1996, that Mrs. Sparks has no interest in that real estate. Her appeal is pending. Paragraph 11 of the Agreement provides for payment to Mrs. Sparks of $100,000 for each year married, up to a maximum of $1 million. It is the effect of the bankruptcy and the Plan on that obligation that is now in dispute.

The Debtor filed this bankruptcy case on September 29, 1992. Mrs. Sparks did not file a proof of claim in this case, although she sought and was granted one extension of time in which to do so. This Court denied Mrs. Sparks' later request to file a proof of claim after that extended bar date had passed. This Court confirmed the Debtor's plan of reorganization on April 4, 1996.

Article 4 of the Plan provides that Mrs. Sparks will receive up to $650,000 upon entry of a judgment by the Circuit Court, pursuant to the Antenuptial Agreement, "but only to the extent that the Bankruptcy Court or some other court of competent jurisdiction determined that some or all of the same claims due under that judgment is not a dischargeable claim under Code section 523(a)(5)...." Therefore, because she did not timely file a proof of claim, Mrs. Sparks will receive no distribution under the plan unless her claim is excepted from discharge by § 523(a)(5).

In Schedule G of the original schedules filed by the Debtor, the Agreement was listed as an executory contract. Article 6 of the Plan governs executory contracts. It provides:

> All executory contracts and/or unexpired leases which have not, prior to the entry of the order of Confirmation, been rejected pursuant to Code § 365 or renegotiated, or which have not already expired by their own terms, or which have not been otherwise provided for under this Plan, shall be deemed assumed by Debtor upon the Effective Date.

## DISCUSSION

### Debtor's Motion for Summary Judgment on § 523(a)(5)

#### A. Antenuptial Agreements Are Within the Scope of § 523(a)(5).

The Debtor contends that any claims arising out of the Agreement are not, as a matter of law, within the types of claims rendered non-dischargeable by § 523(a)(5). Mrs. Sparks contends that there is a question of fact concerning whether the payment provided under the Agreement was in the nature of support and that the motion for summary judgment must therefore be denied.

Section 1141(d) provides that confirmation of a plan of reorganization discharges an individual debtor (such as Mr. Sparks) from all debts arising before confirmation, except debts excepted from discharge by § 523.

---

1. In his Statement of Uncontested Facts filed in support of his motion, the Debtor referred to the deposition of Margaret Sparks but did not file a transcript. In her response, Mrs. Sparks pointed out this deficiency, responded that the statements were not relevant, but that she did not contest their accuracy. Despite the fact that Mrs. Sparks pointed out this deficiency, the Debtor failed to correct it. A majority of the statements were not relevant, but this Court will disregard all statements that are not supported by materials "on file" as required by Fed.R.Civ.P. 56(c). See also, Local Rule 402(M).

Section 523(a)(5) provides that a discharge under § 1141 does not discharge an individual debtor from any debt—

> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

The Debtor asserts that he has found no cases holding that a claim under an antenuptial agreement may be non-dischargeable under § 523(a)(5).[2] Since the Agreement was entered into by the parties in contemplation of marriage, it is clearly not a "separation agreement" or "divorce decree or other order of a court of record." To fall within the ambit of § 523(a)(5), the Agreement, therefore, must be a "property settlement agreement." If an antenuptial agreement is not a property settlement agreement within the meaning of that section, then a claim under an antenuptial agreement would be excluded from the exception to discharge designed to include all other bases for alimony, maintenance or support. It is unlikely that Congress would have intended to exclude a whole class of agreements governing marital rights from such an otherwise all-inclusive provision.

■ There is nothing inherent in an antenuptial agreement that would preclude payments made under such an agreement from being in the nature of alimony, maintenance or support, rather than a settlement of anticipated claims to property. The determination of whether a debt is in the nature of alimony, maintenance or support is to be made under federal bankruptcy law. *In re Paneras*, 195 B.R. 395 (Bankr.N.D.Ill.1996). State law may, however, be looked to for guidance. *Id.* at 401. Courts have articulated a number of "factors" they have considered relevant:

(1) whether the obligation terminates upon the death or remarriage of either spouse (termination of the obligation indicates the obligation was for support); (2) whether the obligation is payable in a lump sum or in installments over a period of time (obligation spread over time indicates the obligation was for support); (3) whether the payments attempt to balance the parties' income (payments to balance income indicate the payments were for support); (4) the characterization of the obligation in the decree (obligations described as support indicate the obligation was for support); (5) the placement of the obligation in the decree (obligations under the heading support indicate the obligation was for support); (6) whether there is any mention of support payments (separate mention of support payments indicates the obligation is not for support); (7) whether there are children who need support (if children are of the age when support is required, this indicates the payments may be for support); (8) whether there is a large differential in net income (a large differential in income would indicate the payments were for support); and (9) whether the obligation was thought to be taxable to the recipient (payments thought to be taxable indicate the payments were for support).

■ *Paneras* at 401–402. In another context, this Court has rejected the "factor counting" method of fact finding. *In re Murphy*, 190 B.R. 327 (Bankr.N.D.Ill.1995). Nevertheless, these lists of "factors" are useful to illustrate the categories of evidence that other courts have found relevant in similar cases. The ultimate inquiry is whether the parties intended to provide support. *Id.* at 402; *In re Vaudreuil v. Busconi*, 182 B.R. 618, 620 (D.Mass.1995). Similar evidence of intent would be just as relevant in a proceeding involving an antenuptial agreement. Of course, the conditions of the parties may well be different at the time of the marital dissolution than they were before the marriage, and that may make the evaluation of some evidence appear problematic. But keeping

---

**2.** This Court has found one case, discussed *infra*,

*In re Vaudreuil*, 182 B.R. 618 (D.Mass.1995).

in mind that it is the parties' intent at the time they entered into the agreement that is paramount, there is no logically compelling reason that an obligation under an antenuptial agreement could never be proven to be in the nature of alimony, maintenance or support.

The one case we have found that dealt with an antenuptial agreement in the context of § 523(a)(5) illustrates that point. The reported decision did not discuss, but simply assumed, that such an agreement is covered by that section. In *Vaudreuil*, 182 B.R. 618, the antenuptial agreement provided that the wife would receive a home valued at $750,-000, $250,000 in cash, and "alimony" totaling $40,000 per year. The payments would continue whether or not the wife remarried. The evidence presented on a motion for summary judgment established that the monthly payments were labeled "alimony" for tax purposes and the monthly amount was not based upon need. The bankruptcy court granted a motion for summary judgment in favor of the debtor finding that the payments were a "property distribution" and therefore dischargeable. The district court reversed, finding that there was an issue of material fact as to the parties true intent. That court found that there was also evidence that could support a finding that the payments were in the nature of alimony, including findings by the probate court that implied it believed the payments were for support, and that the debtor supported the former spouse and her children from a prior marriage during their marriage. So both the bankruptcy and district courts were able to apply the usual § 523(a)(5) analysis to the antenuptial agreement before it.

Moreover, so long as such agreements are enforceable under non-bankruptcy law, there is no equitable reason why they should not be given effect in bankruptcy according to the parties' intent as of the time that intent was expressed. To the contrary, it would be inequitable to deprive a spouse of agreed support merely because the agreement was made before the marriage, rather than at the time of the divorce. Couples enter into such agreements to limit their risks and create certainty about future rights and obligations.

They agree that changes in circumstances will not affect those rights and obligations. Whether the agreement was intended to provide support (nondischargeable) or settle anticipated claims to property (dischargeable), it should be treated with in bankruptcy according to that intent.

For these reasons, the Court holds that the Agreement is within the scope of § 523(a)(5). The next question is whether the nature of the obligation contained in paragraph 11 of the Agreement is genuinely at issue.

## B. Whether the Obligation Created by the Agreement is in the Nature of Alimony, Maintenance or Support is a Genuine Issue of Material Fact.

■ The Debtor argues that Mrs. Sparks testified that she had no particular intent as to the meaning of the agreement when she signed it, so intent must be inferred from the document itself. However, there is evidence from which it might be inferred that the payments were intended to be support. Mrs. Sparks was pregnant with the Debtor's child at the time she executed the Agreement. There was a great disparity in their incomes, and Mrs. Sparks was giving up her career as a secretary to marry and tend to Mr. Sparks' home and child. The presence of minor children and an "imbalance in the relative income of the parties" should be considered when determining whether an obligation was intended as support. *Shaver v. Shaver*, 736 F.2d 1314 (9th Cir.1984).

■ While the Debtor argues that Mrs. Sparks is capable of resuming her career as a secretary, support is not necessarily limited to allowing the former spouse to "just get by," but may include payments that permit the former spouse to maintain the same standard of living as he or she had while married. *See In re Fitzgerald*, 9 F.3d 517, 521 (6th Cir.1993). Here, the parties may have reasonably anticipated when they signed the Agreement that Mrs. Sparks would be enjoying a better life style, in the material sense, than she had before, and intended the payments to enable her to maintain some part of that life style. And the Agreement does provide in paragraph 11 that the "obligation

of MICHAEL to pay to PEGGY support and maintenance ... shall be limited to the amount herinabove specified...."

On the other hand, that the payments continue notwithstanding remarriage by Mrs. Sparks suggests that the payment may be a property settlement. So do the provisions in the Agreement that the payments are in lieu of support and will not be affected by changes in the financial circumstances of the parties during the marriage.

■ In short, there is an issue that must be tried. That issue is whether at the time they entered into the Agreement the parties intended that the payments the Debtor would be obligated to make to Mrs. Sparks would be in the nature of alimony, maintenance or support, rather than a settlement of any claims to property that Mrs. Sparks might have been expected to acquire as a result of the forthcoming marriage.[3] Accordingly, this Court finds that there are genuine issues of material fact and denies the Debtor's motion for summary judgment under § 523(a)(5).

## Motions for Summary Judgment on Counter Claim—Executory Contract

### 1. The Antenuptial Agreement is not an Executory Contract

Both parties have moved for summary judgment on the counterclaim, which alleges that the Agreement is an executory contract assumed by the Plan. The Debtor contends that the Agreement can not be an executory contract because Mrs. Sparks fully performed all material obligations under the Agreement pre-petition, when she married him. On the other hand, Mrs. Sparks argues that the "most compelling evidence" that the Agreement is an executory contract is the fact that the Debtor scheduled it as such on

schedule G of the bankruptcy schedules. She also argues that she had continuing obligations to perform under the Agreement, such as the requirement in ¶ 18 of the Agreement that she execute documents necessary to effectuate the Agreement.

■ While the term "executory contract" is not defined by the Bankruptcy Code, the issue is one of federal bankruptcy law and is not to be decided by the debtor or other parties in interest. *In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1495, 1496 (9th Cir.1991) ("the existence of substantial unperformed obligations on both sides determines this issue.") Accordingly, the fact that the Debtor initially scheduled the Agreement as an executory contract has little effect on this decision.

The Seventh Circuit has adopted the Countryman definition of "executory contract," which provides that "a contract is executory for bankruptcy purposes where 'the obligation of both the bankruptcy and the other party to the contract are so far unperformed that the failure to complete performance would be a material breach excusing the performance of the other.'" *In re Crippin,* 877 F.2d 594, 596 (7th Cir.1989); *In re Gouveia v. Tazbir,* 37 F.3d 295 (7th Cir.1994). The legislative history also indicates that it "includes contracts on which performance is due to some extent on both sides." H.R. Rep 595, 95th Cong. 1st Sess. 347 (1977). A more useful definition is suggested in a landmark law review article, Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding "Rejection," 59 U.Colo.L.Rev. 845, 893 (1988): "a contract under which (a) debtor and non-debtor each have unperformed obligations, and (b) the debtor, if it ceased further performance, would have no right to the other party's performance." [4]

---

3. So stated, the issue to be tried excludes other issues. The relevant time is when the parties signed the Agreement. Therefore, the circumstances of the parties thereafter, including as of the time of trial, would not be relevant. Similarly, since the Agreement fixes the amount of the payments, evidence relating to the degree of Mrs. Sparks's current needs would not be relevant. (In any event, it would not be for this Court to fix the amount of support.)

4. Andrew's central point is that:
... when rejection is at issue, the definition of an "executory" contract should not matter. What a trustee or debtor in possession rejects, on behalf of the estate, is the transfer of the asset represented by a pending contract or lease (i.e., the right to the further performance of the non-debtor party), not the liability. Rejection of an "executory" contract or lease simply places non-debtor in the same position as other claimants in bankruptcy.

Mrs. Sparks relies on the following provisions of the Agreement as creating continuing obligations to perform:

- both parties are required to execute such documents as necessary to effectuate the Agreement, ¶¶ 8 and 18;

- ◆ the divorce court is to determine at the time it enters a judgment of dissolution of marriage whether property was marital or non-martial, ¶¶ 4, 5 and 8;

- Mrs. Sparks agreed not to assert surviving spouse's rights or renounce the Debtor's will in the event of his death, ¶ 15;

- the Agreement established rights in property not yet acquired, ¶¶ 12 and 13;

- the Debtor is to make payments in the future in the event of a dissolution of the marriage, ¶ 11.

■ Most of the provisions relied upon by Mrs. Sparks do not require action by either her or the Debtor in the future; rather they were present agreements to waive rights she might have otherwise had, including rights relating to future-acquired property. That the divorce court is to make determinations in the future does not involve performance by either party. And the Debtor's payment obligations require performance by him, but not by the other party, Mrs. Sparks. *See In re Murtishi,* 55 B.R. 564, 567 (Bankr.N.D.Ill.1985)(fact that the debtor has not yet performed does not make contract executory). Indeed, every claim in bankruptcy arises from an unperformed obligation of the debtor.

■ The only act that could be required of Mrs. Sparks is the execution of "such waivers, disclaimers, releases or conveyances as may be necessary more fully to effectuate the provisions and purposes of this agreement...." ¶ 18. Paragraph 8 provides that Mrs. Sparks "will execute any and all documents necessary" to effect any transfer of the Debtor's property. No specific document is required by the Agreement. To satisfy the Countryman definition, the performance obligation must be material. A material breach is one that will excuse performance by the other party. *Israel v. National Canada Corp.,* 276 Ill.App.3d 454, 461, 213 Ill.Dec. 163, 169, 658 N.E.2d 1184, 1190 (1st Dist. 1996)("only a material breach of a contract provision will justify non-performance by the other party").

■ As Andrew's definition emphasizes, the proper focus is on the asset value of the contract; that is, the value of the performance due from the non-debtor. Assumption is appropriate when there is a benefit, or value, to the estate that can only be obtained by assuming the obligations of a pre-petition contract. When there is no such value to be obtained, there should be no assumption.[5] The obligation to execute transfer and waiver documents in this matter was never more than a generalized requirement to do what may become necessary to carry out the terms of an agreement already made.[6] No such documents ever needed to be executed, even before confirmation of the Plan. Then the Plan dealt with all the Debtor's property and obligations. There was no need for Mrs. Sparks's signature to carry out the Plan. Certainly by the time of plan con-

*Id.,* at 889–90. That is why Andrew's definition, more clearly than Countryman's, focuses on the asset value of the contract (the other party's promise of performance), and whether the estate must agree to perform the debtor's obligations in order to capture that value. The two definitions are consistent with one another; Andrew's is simply more to the point.

In this case, assumption, not rejection is at issue. Moreover, the issue here is what the Plan means when it uses the phrase "executory contract." Therefore, the definition does matter.

**5.** "Assumption is proper when the estate, as successor to the debtor, can obtain the benefit of some contract or lease (if it properly chooses to

do so) only at the cost of taking on the debtor's performance obligations. Any other use of 'assumption' confers priority for priority's sake, for the purpose of elevating a claim to administrative status rather than as a means of obtaining some contractual benefit." *Andrew,* at 890.

**6.** The authority relied upon by Mrs. Sparks in fact supports a finding that the agreement was fully performed. *See In re Estate of Trecker,* 107 Ill.App.2d 94, 246 N.E.2d 56 (1st Dist.1969)(evidence supported findings of consideration and *performance* of post-nuptial agreement containing a renunciation of widow's award where parties relied upon agreement for 42 years).

firmation, if not before, the obligation to execute documents was of no material importance to the Debtor or the estate. And it is the time of confirmation that is relevant to the issue here. Cf., *In re Leibinger–Roberts, Inc.*, 105 B.R. 208, 211 (Bankr.E.D.N.Y. 1989)("... there is no present benefit from the ... agreement which would call for its assumption.") It would make no sense to hold that the Plan that dealt with all the Debtor's property without the need for Mrs. Sparks's cooperation assumed a contract that required no performance on her part except that unneeded cooperation. Such a holding would merely "confer[ ] priority for priority's sake." See footnote 5, above.

 Mrs. Sparks relies on *In re Lawson*, 146 B.R. 663 (Bankr.E.D.Va.1992), *aff'd in part and rev'd in part*, 1993 WL 513830 (4th Cir. Dec.9, 1993)(unpublished opinion). That reliance is misplaced. On appeal, the circuit court held that the issue of the "executoriness" of the contract was not relevant to an agreement for support and reversed the district court's approval of the debtor's rejection of the contract. Although this Court strongly disagrees with the reasoning upon which that reversal is based,[7] *Lawson* is distinguishable in any event. The postnuptial agreement involved in that case required material performance in the future by both parties—the conveyance of identified propertied into a trust. Mrs. Sparks has no similar obligation here.

7. The Fourth Circuit's central holding is simply wrong. *Lawson* involved a post-nuptial agreement that the debtor had rejected. The majority, for some reason, came to believe that rejection of the agreement would have the effect of "wiping out a support agreement." 1993 WL 513830, *4. That, of course, is wrong. Rejection is no more than a breach of contract; it does not wipe out anything, but leaves the other party with the rights of a non-breaching party. See *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 711 (Bankr.S.D.N.Y.1992)(" ... we repudiate Debtor's contention that rejection vaporizes or otherwise avoids [the non-debtor's] interest in the escrowed funds.") If a contract creates a nondischargeable support obligation, the rejection of that contract does not erase that obligation.

The majority's holding (which reversed both the district and bankruptcy courts) is particularly baffling in view of the dissent's clear response:

For these reasons, the Agreement is not an executory contract and therefore was not assumed by the Plan.

### 2. If the Antenuptial Agreement were an Executory Contract, it was Rejected by the Plan

 Mrs. Sparks argues that the Agreement has never been expressly rejected and therefore it was assumed by Article 6 of the Plan which provided that "[a]ll executory contracts, ... which have not, prior to the entry of the order of Confirmation, been rejected pursuant to Code § 365 or renegotiated, ... *or which have not been otherwise provided for under this Plan,* shall be deemed assumed by Debtor upon the Effective Date." (Emphasis added). The Agreement was "otherwise provided for" in Article 4 of the Plan. Article 4 provides that the only claim Mrs. Sparks may have under the Agreement is for $650,000, but only if a court first determines that her claim is excepted from discharge under § 523(a)(5).

Accordingly, this Court finds that even if the Agreement were an executory contract, it was not assumed by the Plan.

### CONCLUSION

Because she did not timely file a proof of claim, Mrs. Sparks's' claim (unlike other claims) is not payable under the plan, and is discharged, unless it is excepted from discharge by§ 523(a)(5). For the reasons set forth above, this Court finds that there are genuine issues of fact concerning whether

Whether the debt arising from the rejection of an executory contract is dischargeable under section 523 ... has no bearing whatsoever on whether it is rejectable under section 365. It is entirely possible under the law, although the majority inexplicably appears not to believe it so, for Mr. Lawson to reject the executory contract under section 365, but for the underlying debt to be non-dischargeable under section 523. [1993 WL 513830, **11.]

The holding is also baffling because the majority itself cited *Drexel Burnham* precisely for the proposition that the "executoriness" of a contract makes no practical difference when the issue is rejection, but ignores the reason "executoriness" makes no difference, even though that reason (i.e., rejection is merely a breach that does not destroy the non-debtor's rights) was explained in both the dissent and *Drexel Burnham.*

Mrs. Sparks debt is excepted from discharge under § 523(a)(5) and denies the Debtor's Motion for Summary Judgment on the complaint. This Court also finds that the Antenuptial Agreement is not an executory contract and that, even if it were, it was not assumed by the Plan. Accordingly, the Debtor's Motion for Summary Judgment on the counterclaim is granted and Mrs. Sparks' Motion for Summary Judgment is denied.