**In re RESOURCE TECHNOLOGY CORPORATION, Debtor.**

**No. 99 B 35434.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 25, 2000.

Michael L. Gesas, Gesas, Pilati & Gesas, Ltd., Chicago, IL, for Allied Waste Industries, Inc.

Robert M. Fishman, Shaw, Gussis, Domanskis, Fishman & Glantz, Chicago, IL, for Resource Technology Corporation.

William J. Factor, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for TransAmerican Waste Industries, Inc.

Gerald F. Munitz, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, for American Grading Company.

Marc Kieselstein, Sachnoff & Weaver, Ltd., Chicago, IL, for Congress Development Company.

Stuart M. Rozen, Mayer, Brown & Platt, Chicago, IL, for Caterpillar Financial Services Corporation.

William J. Barrett, Gardner, Carton & Douglas, Chicago, IL, for The Official Committee of Unsecured Creditors.

Steven B. Towbin, D'Ancona & Pflaum, LLC, Chicago, IL, for Leon Greenblatt, individually and as agent for Chiplease, Inc. and Banco Panamericano, Inc.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

The debtor in this Chapter 11 case, Resource Technology Corporation ("RTC"), is in the business of collecting methane gas from landfills, converting the gas to electricity, and selling the electricity to power companies. RTC's bankruptcy case is now before the court on a motion brought by one of the landfill owners with which RTC does business—Allied Waste Industries, Inc. ("Allied"). Allied's motion seeks a court order requiring RTC to assume or reject an agreement governing the collection of methane gas on landfills owned by Allied. RTC has opposed the motion, and the principal issue now in dispute is whether the agreement is an "executory contract or unexpired lease" under § 365 of the Bankruptcy Code (Title 11, U.S.C.). For the reasons discussed below, the agreement between the parties is indeed an executory contract within the meaning of § 365, which RTC must assume or reject.

A subsidiary issue raised by the motion is whether the agreement is also a lease of nonresidential real property. If it were, then, among other consequences, § 365(d)(4) would impose deadlines for assumption. Again for reasons set forth below, the agreement is not a lease. However, given the significance of the agreement to any reorganization of RTC, the court has exercised its discretion to require RTC to make a prompt decision on assumption or rejection.

## Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). However, pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of all bankruptcy cases in this district. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments as to core proceedings within the case. The determination of whether an agreement is executory is a core proceeding—under 28 U.S.C. § 157(b)(2)(A) (as a matter concerning the administration of the estate), and under 28 U.S.C. § 157(b)(2)(O) (as a proceeding adjusting the debtor-creditor relationship). *In re Dunes Hotel Associates*, 194 B.R. 967, 992–93 (Bankr.D.S.C.1995); *see Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1208 (7th Cir.1984) (holding that a determination of the executory nature of a contract was within the jurisdiction of the bankruptcy court under the temporary jurisdictional system that was the model for the present law). Accordingly, this court may enter a final order resolving the pending motion.

## Findings of Fact

The facts relevant to a resolution of the pending motion are not in dispute.

One of the methods for disposing of garbage in this country is by dumping it into landfills, where the garbage decomposes, producing methane gas. This gas is malodorous, environmentally harmful, and potentially explosive; its collection and removal is subject to governmental regulation. However, once extracted from a landfill, methane gas can be converted into electricity, and federal tax incentives encourage the sale of electricity generated in this way.

As noted above, the debtor in this case, Resource Technology Corporation, is in the business of removing methane gas from landfills and converting the gas to

saleable electricity. As part of its business, RTC entered into an agreement to collect and remove methane gas from landfills owned by Allied Waste Industries, Inc.[1]

*Terms of the agreement.* The RTC/Allied agreement is dated December 21, 1995, and has no descriptive title—it is labeled simply "Agreement." The agreement is introduced by a series of recitals, stating that its purpose is to transfer, from Allied to RTC, three exclusive rights: (1) the right "to develop and install a landfill-gas-to-energy conversion project" at four Allied landfills, including one located near Pontiac, Illinois; (2) the right "to collect, extract and remove" the gas from these landfills; and (3) the right "to convert all or any portion of such . . . gas into electrical energy . . . for the purpose of selling . . . such . . . energy." The agreement subsequently (in ¶ 3) makes an express grant of these rights, and additionally allows RTC to perform at the landfills "all things necessary to carry out" its rights under the agreement, subject to the requirement that it take this action "in cooperation with [Allied] and not in interference with [Allied's] operations." More specifically (in ¶ 5), the agreement specifies that RTC has the right to full access to those portions of the landfills on which its gas collection and conversion system has been installed, except for Allied's buildings and active areas of the landfills.

In consideration for receiving these rights, the agreement imposes two sets of obligations on RTC. First, it requires RTC to exercise its rights. The agreement provides (in ¶ 7(a) and (c)) that RTC must (1) install, at its expense, a system for gas collection, extraction, and gas-to-energy conversion at each landfill site; (2) obtain all necessary governmental permits for these systems; and (3) operate the systems, in compliance with all applicable governmental regulations.

Second, the agreement requires RTC to make two kinds of payments to Allied: first, a monthly "royalty" of 6% of the proceeds it received in the prior month from sales of converted-gas energy (¶ 2), and second, beginning with the year in which a gas-to-energy project was in operation at any landfill, an annual payment of 50% of the real estate taxes levied on the landfill (¶ 7(d)).

Paragraph 6 of the agreement sets out a number of provisions requiring that RTC install the gas collection and conversion systems promptly. By December 21, 1996 (12 months after the effective date of the agreement), RTC had to complete a feasibility study for each of the four landfills and submit a letter outlining its intention to proceed with the project. Thereafter, RTC was required to initiate installation of the gas-to-energy conversion project at the landfills within one year, and to complete the installation within three years. Thus, RTC had until December 21, 1999 to complete the project. Moreover, RTC was required to "pursue field testing, licenses, permits, and sales contracts" expeditiously, with any six-month lapse in such activities constituting a "Termination Event."

Other breaches of the agreement by RTC would only constitute a Termination Event if RTC failed to cure the breach within a reasonable time after written notification from Allied. (¶ 10.) In the absence of Termination Events, the agreement was to have an initial term of ten years, subject to the right of RTC to extend the term for as many as three five-year periods (¶ 4), resulting in a maximum term of 25 years.

*Disputes regarding the agreement.* By early 1999, Allied and RTC were involved in a dispute regarding the adequacy of RTC's performance under the agreement. Allied sent a notice of termination, and

---

1. The agreement was actually entered into by American Disposal Services, Inc., a predecessor in interest to Allied. However, the change in ownership has no impact on any of the issues raised by the pending motion, and so this opinion uses "Allied" to refer to both the predecessor and successor entities.

RTC responded by initiating litigation in state court seeking to enjoin Allied from terminating the agreement.

On November 15, 1999, prior to any ruling by the state court on RTC's complaint, the present bankruptcy case was instituted against RTC by an involuntary petition. RTC consented to the entry of an order for relief on January 18, and exercised its right to convert the case to one under Chapter 11. The order for relief under Chapter 11 became effective on February 1, 2000.

On March 16, RTC filed a cautionary motion seeking an extension of time to assume or reject all of the agreements governing its gas collection operations, in the event that these agreements were determined to be leases of nonresidential real estate. The requested extension was granted, with the deadline for assumption or rejection of nonresidential real estate leases ultimately extended through the issuance of this decision.

Allied brought the pending motion on April 21. The motion requested that RTC be required to assume or reject the agreement by a date certain—the matter now in dispute—but only as an alternative form of relief. The relief principally sought by the motion was modification of the automatic stay imposed by § 362(a) of the Bankruptcy Code, so as to permit Allied to terminate the agreement (and thus presumably replace RTC with another contractor for purposes of methane gas collection at its landfills). On June 15, after a hearing addressing environmental concerns at the Pontiac landfill, the court entered an order denying the request for immediate termination of the agreement, reserving the question of assumption or rejection of the agreement for further consideration.

Because the resolution of this question potentially affects numerous other agreements between RTC and landfill owners, and because it may have a significant impact on RTC's ability to reorganize, a number of other interested parties sought and were granted an opportunity to submit briefs on the question.

On June 13, while Allied's motion was under consideration, RTC sought court approval of a several million dollar financing package, designed to allow, among other things, completion of an expanded gas collection and conversion project at the Pontiac site. During the hearing on this matter, RTC presented evidence that the Pontiac project was essential to its planned reorganization. On August 1, the court approved the proposed financing. Following this ruling, the court orally noted its conclusion that the RTC/Allied agreement was executory, and directed RTC to assume or reject the agreement by September 25, 2000.

On September 21, 2000, RTC filed a conditional motion to assume the RTC/Allied agreement, reserving—until it could review this opinion—the right to appeal this court's determination that the agreement is executory.

### Conclusions of Law

*The treatment of "executory contracts and unexpired leases."* The issues involved in the present dispute arise out of the special treatment that the Bankruptcy Code provides for executory contracts and unexpired leases.

■ Section 541(a) of the Code creates an estate, which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." This estate is used, directly or indirectly, to pay claims against the debtor that were outstanding at the time the case was filed. *See In re Fisher,* 198 B.R. 721, 727–29 (Bankr.N.D.Ill.1996), *rev'd on other grounds,* 203 B.R. 958 (N.D.Ill.1997) (discussing the role of the estate in bankruptcy). The scope of property interests included in the estate under § 541(a) is quite broad, and includes any contract rights that a debtor possesses at the time of the bankruptcy filing. *See Houston v. Edgeworth (In re Edgeworth),* 993 F.2d 51, 55 (5th Cir.1993) (holding that the estate in-

cludes any contract rights that the debtor has under an insurance policy). Ordinarily, estate property remains in the estate until it is either disposed of (through sale or abandonment), or until the administration of the estate ends (by closing the case or confirming a Chapter 11 plan). *See* 11 U.S.C. §§ 363 (providing for sale of estate property), 554 (providing that property with no substantial value to the estate may be abandoned, and that property not otherwise administered is generally abandoned at the time the case is closed); 1141(b) (confirmation of a Chapter 11 plan generally vests property of the estate in the debtor).

However, this fairly straightforward treatment of estate property is complicated when the property is contract rights under an "executory contract or unexpired lease." To such property, § 365 of the Code applies four special provisions:

■ (1) Instead of being subject to sale under § 363 of the Code, an estate's rights under executory contracts can only be transferred, by assignment, after the contract is "assumed." 11 U.S.C. § 365(f)(2)(A). Assumption carries with it two substantial burdens to the estate. First, the estate takes on the debtor's obligations under the contract and these obligations become administrative expenses, which must be paid as a priority, before the debtor's prebankruptcy obligations. *Enterprise Energy Corp. v. United States (In re Columbia Gas System Inc.)*, 50 F.3d 233, 238–39 (3d Cir.1995). Second, pursuant to § 365(b), the trustee or debtor in possession may only assume the contract after demonstrating that the estate is able to meet the debtor's obligations—by promptly curing any existing defaults and giving adequate assurance of future performance. *Metropolitan Airports Commission v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 496 (7th Cir.1993).

■ (2) If the trustee or debtor in possession chooses not to assume an executory contract—which the Code refers to as "rejection"—there is no subsequent performance by the estate of the debtor's obligations under the contract, and, pursuant to § 365(g), the contract or lease will be deemed breached by the debtor, with the nondebtor party to the contract given a general (nonpriority) claim against the estate for the breach of contract. *In re Lavigne*, 114 F.3d 379, 387 (2d Cir.1997).

■ (3) During the period prior to assumption or rejection of an executory contract or unexpired lease, the estate must pay the reasonable value of any contractual benefits the estate receives during that period, as an administrative expense. *Continental Energy Assocs. L.P. v. Hazelton Fuel Mgmt. Co. (In re Continental Energy Assocs. L.P.)*, 178 B.R. 405, 408 (Bankr.M.D.Pa.1995) (collecting authorities). For an unexpired lease of nonresidential real property, the estate must pay, during the period prior to assumption or rejection, all of the sums that are due for that period under the lease. 11 U.S.C. § 365(d)(3). For an unexpired lease of personal property in a Chapter 11 case, the estate must generally pay all sums that become due under the lease from a date 60 days after the case filing until the lease is assumed or rejected. 11 U.S.C. § 365(d)(10).

(4) There are varying deadlines for assumption or rejection. For unexpired leases of nonresidential real property, under any chapter of the Code, the lease is deemed rejected if it is not assumed within 60 days from the date of the order for relief (subject to extension by court order). 11 U.S.C. § 365(d)(4). For other unexpired leases and executory contracts, there is a similar 60–day deadline in Chapter 7 cases, and in other chapters of the Code, assumption or rejection must take place prior to confirmation of a plan, unless the court sets an earlier deadline. 11 U.S.C. § 365(d)(1)–(2).

■ RTC's rights under its agreement with Allied are property of the estate in

this bankruptcy case.[2] But the extent to which the estate can benefit from these rights depends on whether the agreement is within the scope of § 365. If § 365 applies to the RTC/Allied agreement, RTC would have to assume or reject it, with assumption giving rise to substantial obligations. Moreover, if the agreement is an unexpired lease of nonresidential real property, there would be automatic deadlines for assumption or rejection as well as pre-assumption payment requirements under § 365(d)(3). For these reasons, RTC understandably contends that the agreement is not an executory contract or unexpired lease.

■ *The meaning of "executory contract."* There is no definition of executory contract in the Code, and the legislative history is sparse.[3] However, the background and purpose of § 365 indicate that "executory contracts" are those that present the estate with a "mixed blessing"— potential contractual benefits that can only be obtained at the cost of the debtor's performance under the contract. *See Cheadle v. Appleatchee Riders Ass'n (In re Lovitt), 757 F.2d 1035, 1041 (9th Cir.1985)* (describing "executory contracts and leases" under pre-Code law as "involv[ing] future liabilities as well as rights)"; *Enterprise Energy Corp. v. United States (In re Columbia Gas System Inc.), 50 F.3d 233,*

238 (3d Cir.1995) ("Executory contracts in bankruptcy are best recognized as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability."). An easy example of such a contract is a long term sales contract in which the debtor is the seller; such a contract presents the potential benefit of sales receipts, but only at the cost of supplying goods.

With such a contract, two different questions arise: (1) is the estate obliged to perform the debtor's contractual obligations, and, (2) if the estate does not perform these obligations, what is its liability for damages to the nondebtor party. As outlined above, § 365 answers these questions by generally providing (1) that the estate is only fully liable for the debtor's obligations if the contract is assumed, and (2) that if the contract is rejected, the nondebtor party has only a general unsecured claim for breach of contract against the estate.

■ In contrast, where the debtor was a party to a contract that does not involve both (1) potential future benefits and (2) potential performance costs to the estate, the provisions of § 365 have no

---

**2.** One party that joined in the briefing of this matter has argued, pursuant to § 541(b)(4)(A) of the Code, that the agreement between RTC and Allied is not property of RTC's estate, and therefore not subject to assumption or rejection. Section 541(b)(4)(A) states, in relevant part:

Property of the estate does not include ... any interest of the debtor in liquid or gaseous hydrocarbons to the extent that (i) the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3)....

There are no published opinions construing this language. However, by its terms, the paragraph deals with interests of the debtor in "gaseous hydrocarbons" and not contract

rights like the ones involved here. (The legislative history of § 541(b)(4) indicates that it was enacted to address questions related to the transfer of rights in oil and gas leases. H.R.Rep. 102–474, pt. 7, at 8–10 (1992).) In this case the question is the right of the debtor to continue to operate under its agreement with Allied, not its right to the methane gas collected under that agreement. Accordingly, § 541(b)(4)(A) has no effect on the issues presented here.

**3.** The only relevant discussion in the Congressional reports is that "there is no precise definition of what contracts are executory," but that the concept "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 95–595, at 347 (1977); S.Rep. No. 95–989, at 58 (1978).

reasonable application. On one hand, if there is no potential benefit to the estate from the contract—because the other party to the contract has already performed all of its substantial obligations (so that the debtor has an obligation to perform under the contract without any further action by the nondebtor)—then the nondebtor simply has a claim arising from the debtor's failure to complete the contract. Conversely, if the debtor has substantially performed its obligations under a contract, so that the estate is entitled to the benefits of the contract without further performance (i.e., if any further performance required by the debtor is so insignificant that failure to perform would be a nonmaterial breach), then the right to the nondebtor's performance is simply an asset of the estate, and again, the contract is not executory. *Columbia Gas System,* 50 F.3d at 239–40.[4]

4. Thus, for purposes of the application of § 365, all of a debtor's contracts fall within one of three categories:

(1) *Simple estate liability.* Where the nondebtor has substantially performed all of its obligations, and is owed performance by the debtor, the contract is nonexecutory, and simply provides the nondebtor with a claim against the estate.

(2) *Simple estate asset.* Where the debtor has substantially performed all of its obligations under the contract, and is owed performance by the nondebtor party, the contract is nonexecutory, and simply presents the estate with an asset in the form of noncontingent contract rights.

(3) *Executory contract.* Where each party has unperformed obligations contingent on performance by the other, there is an executory contract or unexpired lease to which § 365 applies.

5. A more direct definition, with the same effect, is suggested in Michael T. Andrews, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L.Rev. 845, 893 (1988): "[A]n executory contract might ... be defined simply as a contract under which (a) debtor and non-debtor each have unperformed obligations, and (b) the debtor, if it ceased further performance, would have no right to the other party's continued performance." *See Sparks v. Sparks (In re Sparks),* 206 B.R. 481, 487 n. 4 (Bankr.N.D.Ill.1997)

This understanding is reflected in a definition, fashioned by Professor Vern Countryman, which states that an executory contract is one in which "the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance by the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973). The Countryman definition has been applied in a number of bankruptcy decisions, including *Columbia Gas System,* 50 F.3d at 239, and several decisions of the Seventh Circuit, e.g., *Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233, 235 (7th Cir.1989); *In re Crippin,* 877 F.2d 594, 596 (7th Cir.1989).[5] Accordingly, the understanding of "executory contract" reflected in the Countryman definition must be applied here.[6]

(Countryman and Andrews definitions are consistent, but Andrews is "more to the point").

6. One of the parties supporting RTC's position has argued in favor of an alternative understanding of "executory contract"—the "functional approach" of *In re Jolly,* 574 F.2d 349 (6th Cir.1978), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). Under this approach, the question of whether a contract is executory is decided according to the impact that the answer would have on the bankruptcy case. The functional approach has been most commonly used to treat as executory a contract that might otherwise have been seen as fully performed by the nondebtor party, with the result of allowing the debtor to reject the contract. *See Phar-Mor, Inc. v. Strouss Building Assocs.,* 204 B.R. 948, 952 (N.D.Ohio 1997) (under the functional approach, "a court should find [a] contract executory if such a determination allows the debtor to reject a burdensome or unfavorable contract"). These decisions may be based on a misunderstanding of the effect of rejection, which merely gives the nondebtor party to a contract the same claim against the estate that it would have had under a fully performed nonexecutory contract. *See* Andrews, 59 U. Colo. L.Rev. 884–95.

However, occasionally the functional approach has been used to find nonexecutory a contract which, under the Countryman test,

*The executory nature of the RTC/Allied agreement.* Consistent with the understanding of "executory" outlined above, the dispute here has focused on the question of Allied's remaining contractual obligations.[7] RTC, supported by creditor interests not involved with landfills, argues Allied has substantially performed all of its obligations under the agreement—i.e., that no substantial performance by Allied remains conditional on RTC's performance. Allied (joined by other landfill owners) argues that its performance under its agreement with RTC is ongoing and substantial.

■ Arguments of this sort have been addressed in a number of reported decisions, all of which present the same situation—the estate argues that some asset was transferred to the debtor, prior to the bankruptcy filing, and that whatever consideration remains owing from the debtor for the asset is simply a claim against the estate; the other party to the contract contends, on the contrary, that it has not completed any transfer, but is involved in an ongoing contract, which the estate must assume if it wishes to retain the benefits being received. The nature of the asset involved in these decisions varies, but the relevant considerations remain the same. *See, e.g., Powers v. Royce Inc. (In re Powers),* 983 F.2d 88 (7th Cir.1993) (household goods); *Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233 (7th Cir.1989) (real property); *In re Qin-* *tex Entertainment, Inc.,* 950 F.2d 1492 (9th Cir.1991) (licensing agreements).

The Seventh Circuit's decision in *Streets & Beard* illustrates the relevant considerations for resolving such disputes. In *Streets & Beard,* the debtor was the buyer under an installment land contract asserted by the seller to be executory. Applying the Countryman definition, the Seventh Circuit saw the critical question as whether the sellers' only substantial obligation—to transfer ownership of the property—was unperformed at the time of the bankruptcy filing, and contingent on performance by the debtor (making the required payments), or whether that obligation of the sellers to transfer ownership had been performed prior to the bankruptcy. The Court determined this issue in the debtor's favor, holding that, under Illinois law, "the debtor became the equitable owner of the property upon entry into the contract," and that, accordingly, no substantial obligation remained owing from the sellers, who were seen as having merely retained a security interest in their conveyed property. 882 F.2d at 235.

RTC and its supporters attempt to apply this reasoning to the present situation, arguing that Allied fully performed its substantial obligations at the time it entered into its agreement with RTC. As these parties see the situation, after Allied granted RTC the exclusive rights to collect gas on its landfills, convert the gas to

---

would be executory and subject to assumption or rejection. Thus, *In re Drake,* 136 B.R. 325, 328 (Bankr.D.Mass.1992), applying the functional approach, held that a noncompetition agreement could be assigned by a Chapter 7 trustee without assuming the debtor's obligations not to compete, since holding the contract executory "would be prejudicial to the creditors of the bankruptcy estate." This approach is contrary to the Seventh Circuit precedent cited above, and so cannot be applied in this court. It is also contrary to the principles that underlie § 365. If a debtor's contract rights are contingent on the debtor's performance under the contract, § 365 requires the estate to perform in order to obtain those rights. Returning to the simple example of a contract under which the debtor has

the right to receive payment for goods to be supplied, it would undoubtedly benefit the estate and its other creditors if the buyer could be required to pay without receiving the promised goods—but such a "functional" result would plainly contradict the purpose of § 365. A court cannot, in the name of functionality, allow an estate to obtain a nondebtor's performance under a contract while relieving the estate of the debtor's concomitant obligations.

7. There is no question that RTC has substantial remaining contractual obligations under its agreement with Allied: (1) RTC must actually collect and convert Allied's landfill gas, and sell the resulting electricity, and (2) it must make required payments to Allied.

energy, and sell the energy, Allied had no remaining obligations of any significance.

The difficulty with this argument is that Allied conveyed the rights in question only conditionally—the agreement expressly provides Allied with the right to terminate the agreement in the event that RTC fails to perform. In contrast to *Streets & Beard,* no principle of equity exists to transform Allied's conditional grant into an absolute one. Allied thus has a significant remaining obligation under its agreement with RTC—to continue to allow RTC to collect and convert landfill gas.

The same considerations informed the Seventh Circuit's decision in *Powers v. Royce, Inc. (In re Powers),* 983 F.2d 88 (7th Cir.1993). The property at issue there was household furniture. The debtor asserted that the furniture had been transferred absolutely, with the nondebtor party to the contract retaining a security interest. The nondebtor responded that the right to the furniture had been conveyed only conditionally, pursuant to a "rent-to-own" lease. Finding that the conveyance of the property was in fact conditional—i.e., that the agreement was a "true" lease—the Seventh Circuit held that the agreement was subject to assumption or rejection under § 365. 983 F.2d at 91. Although, as discussed below, the RTC/Allied agreement is not a lease, it shares in common with leases the grant of rights conditional on future performance by the debtor, and thus cannot be seen as an absolute conveyance of those rights.[8]

8. This consideration also disposes of an argument made by the creditors' committee—that the RTC/Allied agreement is a mineral lease, which, under Illinois law, would constitute an absolute conveyance of the minerals involved. (See *In re Hanson Oil Co.,* 97 B.R. 468, 470 (Bankr.S.D.Ill.1989), for a discussion of Illinois mineral leases.) It is highly unlikely, given its subject matter, that the RTC/Allied agreement would be viewed as a mineral lease under Illinois law. First, unlike the oil and natural gas that are the subject of Illinois mineral leases, methane gas is a hazardous byproduct of commercial activity; and second, the RTC agreement is for a term of years, unlike the indefinite "lease" in *Hanson*

Moreover, Allied's obligations under the agreement are not simply passive. Allied is obligated to cooperate with RTC—and, given the interlocking nature of the operation of an active landfill and the collection of methane gas from the landfill, this aspect of the agreement is essential.

Finally, there is no question that Allied's remaining performance obligations are sufficiently material to satisfy the Countryman definition. If Allied defaulted in its remaining obligations under the agreement—by withholding access to its landfills or by refusing to cooperate with RTC's operations—Allied would have materially breached the agreement, and RTC would be excused from further performance.

Accordingly, the RTC/Allied agreement is an executory contract under § 365.

*The meaning of "lease."* The Bankruptcy Code does not define "lease," and the only provision bearing on a definition of "lease" for the purposes of § 365 is § 365(m), which provides that, for purposes of § 365, "leases of real property shall include any rental agreement to use real property." Since "rental agreement" is generally understood as a synonym for "lease," this provision is not particularly helpful.[9]

▮ Rather, the word "lease" in § 365 should be read according to its ordinary meaning—*American Tobacco Co. v. Oil,* and so could not convey all of the methane gas that might be produced by the landfills, even if this gas were a proper subject of a mineral lease. However, the principal difficulty with the committee's argument is that there was no absolute conveyance of any landfill gas under the RTC/Allied agreement. All rights under the agreement were conveyed conditioned on RTC's performance.

9. Thus, § 365(m) cannot be read to transform into a "lease" any agreement that incidentally involves the use of real property. Such a reading, as one of the parties has pointed out, would count as a "lease" a simple ticket to a sporting event.

*Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)—and there is a well-understood, ordinary meaning of "lease": an agreement by the owner of property (the lessor) to allow exclusive possession of that property by another person (the lessee), for a defined period of time, in exchange for payment ("rent") by the lessee, with the property reverting to the lessor at the end of the lessee's period of possession. Thus, *Black's Law Dictionary* 889 (6th ed.1990), provides the following definitions of "lease":

> A contract for exclusive possession of lands, tenements or hereditaments for life, for term of years, at will, or for any interest less than that of lessor, usually for specified rent or compensation. [citing *Feeley v. Michigan Ave. Nat. Bank.,* 141 Ill.App.3d 187, 191, 95 Ill.Dec. 542, 490 N.E.2d 15, 18 (1st Dist.1986) ]

> Agreement under which owner gives up possession and use of his property for valuable consideration and for definite term and at end of term owner has absolute right to retake, control and use property. [citing *Transamerica Leasing Corp. v. Bureau of Revenue,* 80 N.M. 48, 51, 450 P.2d 934, 937 (App. 1969) ]

Under these definitions, the RTC/Allied agreement cannot be seen as a lease. First, Allied conveyed no exclusive right of possession in connection with the agreement; it did not "give up" possession and use to RTC. Rather, Allied merely gave RTC the right to use landfill property in connection with its gas collection and conversion activities, while Allied itself remained in possession of the property. Consistent with the general definitions listed above, the granting of a right to use

property concurrently with the owner is not a "lease". *North Avenue Properties, L.L.C. v. Zoning Board of Appeals,* 312 Ill.App.3d 182, 189, 244 Ill.Dec. 469, 726 N.E.2d 65, 71 (1st Dist.2000) ("A lease is a definite agreement as to the extent and bounds of the property demised and transfers exclusive possession thereof to the lessee.") [10]

More importantly, the grant of a right to use Allied's property was only incidental to the main purpose of the RTC/Allied agreement—the collection and conversion of methane gas. In rejecting the characterization of its agreement with Allied as a lease, RTC has argued that the agreement is actually a license, and the parties have engaged in extensive argument about whether "lease" or "license" more accurately describes the agreement. Neither label, however, captures the essence of the parties' contract. In reality, the agreement is sui generis, a unique contract dealing with an unusual situation—the disposal of a hazardous material which, properly processed, is worth more than the disposal cost. Thus, instead of being paid by Allied for disposing of gas from its landfills, RTC is required to pay Allied for the right to collect the gas. Nevertheless, collection and processing of the gas is the essence of the agreement, not possession and use of any Allied property. Accordingly, the RTC/Allied agreement is not a "lease" or a "rental agreement."

■■■■ *Time for assumption or rejection.* Because the RTC/Allied agreement is a non-lease executory contract, the only deadline set by the Bankruptcy Code for its assumption or rejection, in the context of a Chapter 11 case, is the time of confir-

---

**10.** Parties supporting Allied's position cite Illinois decisions for the proposition that exclusive possession is not required for a lease. One of these decisions, *Miller v. Gordon,* 296 Ill. 346, 350, 129 N.E. 809, 810 (1921), expressly states the contrary, noting that, under a lease, one party must "divest himself of possession and the other party ... come into it." Another decision, *Gustin v. Barney,* 250 Ill.App. 209, 211–12 (2d Dist.1928), treated as

a lease an agreement to allow use of property for hunting purposes, but only after finding that the premises in question were "adapted" particularly for hunting, and could not be used for farming or residences. These decisions, then, are consistent with the ordinary meaning of "lease," which would not apply in the situation of an owner allowing the use of property while continuing to occupy it.

mation of a plan. 11 U.S.C. § 365(d)(2). However, the court may set an earlier deadline on the request of a party to the contract, and Allied has made such a request. *Id.* The question of whether such a deadline should be ordered is left to the court's discretion, with no statutory guidelines. *See Data–Link Systems, Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.),* 715 F.2d 375, 379 (7th Cir.1983) (upholding bankruptcy court's denial of request to set deadline).

In the present case, the court exercised its discretion to require prompt assumption or rejection of the RTC/Allied agreement. RTC has entered into a substantial financing package for the precise purpose of allowing it to develop its ability to generate electricity from Allied's Pontiac landfill gas, and it has stated that this development is the cornerstone of its proposed reorganization. Because the RTC/Allied agreement is executory, Allied can go forward with its proposed reorganization only if it assumes the agreement. Allied and the other parties are entitled to know whether RTC is willing and able to effect such an assumption, or whether it cannot assume the contract and thus must pursue a different course of conduct in this case.

### Conclusion

For the reasons stated above, the RTC/Allied agreement is a non-lease executory contract, which the court has previously directed RTC to assume or reject. A separate order will be entered, consistent with this decision.