**In re PHYSICIAN HEALTH CORPORATION, et al., Debtor.**

**No. 00–4482 MFW.**

United States Bankruptcy Court, D. Delaware.

May 9, 2001.

---

Norman L. Pernick, J. Kate Stickles, Saul Ewing Remick & Saul LLP, Wilmington, DE, Jeff J. Marwil, Mark K. Thomas, Dawn M. Canty, Katten Muchin Zavis, Chicago, IL, for debtors.

David M. Fournier, Pepper Hamilton, LLP, Wilmington, DE, Peter D. Kerth, Gallop, Johnson & Neuman, L.C., St. Louis, MO, for HHC Medical Group.

Bonnie Glantz Fatell, Blank Rome Comisky & McCauley, LLP, Wilmington, DE, Michael S. Fox, Adam H. Friedman, Traub, Bonacquist & Fox LLP, New York City, for the Official Committee of Unsecured Creditors.

Mark D. Collins, Christopher D. Loizides, Richards Layton & Finger, Wilmington, DE, Jacqueline Marcus, Weil Gotshal & Manges LLP, New York City, for BNP Paribas.

Richard Schepacarter, Philadelphia, PA, Office of U.S. Trustee.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of HHC Medical Group, Inc. ("HHC") to compel Physician Health Corporation and its affiliates ("the Debtors") to Assume or Reject the Practice Management Agreement between the Debtors and HHC. The Motion is opposed by the Debtors, the pre- and post–petition lenders, and the Official Committee of Unsecured Creditors ("the Committee"). For the reasons set forth below, we deny the Motion.

## I. FACTUAL BACKGROUND

The Debtors filed voluntary petitions under chapter 11 on December 7, 2000. The Debtors are in the business of managing physician practice groups. As of the filing of their petitions, the Debtors managed 28 practice groups. Since the filing, the Debtors have entered into agreements with many of the practice groups to reject or terminate the management agreements.

On March 13, 2001, HHC filed a Motion seeking to compel the Debtors to decide whether to assume or reject their Practice Management Agreement ("the PMA"). The PMA had been executed by the Debtors and HHC on or about April 11, 1997, and had been amended several times since then.

A hearing was held on the Motion on April 5, 2001, and post-trial submissions, including designations from depositions, were submitted by the parties.

## II. DISCUSSION

■ Section 365(d)(2) permits a debtor to assume or reject an executory contract at any time before confirmation of a plan of reorganization. "Permitting the debtor to make its decision as late as the plan confirmation date enables the debtor to carefully evaluate the possible benefits and burdens of an [executory contract]. It is vitally important to all interested parties that the debtor make a prudent assumption or rejection decision...." *In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (Bankr.W.D.Pa.1985). However, the court, on request of a party to that contract, may order the debtor to decide earlier. 11 U.S.C. § 365(d)(2). In deciding whether to accelerate the debtor's decision, the court must balance the interests of the contracting party against the interests of the debtor and its estate. *See, e.g., Mayer Pollock Steel Corp. v. London Salvage & Trading Co., Ltd. (In re Mayer Pollock Steel Corp.)*, 157 B.R. 952, 965 (Bankr.E.D.Pa.1993); *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J.1986) (citing *In re GHR Energy Corp.*, 41 B.R. 668, 676 (Bankr.D.Mass.1984)).

HHC asserts that the Debtors should be ordered to decide whether to assume or reject its PMA within fifteen days. It offers several reasons for granting this relief. First, it asserts that the Debtors are, and have been, in default of the PMA. Second, HHC asserts that the Debtors have been negotiating with several other practice groups and have agreed to reject their PMAs in exchange for a settlement payment. Since HHC may terminate its PMA in May, 2002, HHC asserts that it is clear that the Debtors will also reject HHC's PMA. In the meantime, HHC asserts that the Debtors continue to collect a management fee without performing any of the required services under the PMA.

■ The Debtors oppose the Motion. In particular, they dispute the allegations

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

of HHC regarding their alleged defaults of the PMA. They also assert that they are acting expeditiously to determine how to deal with their various practice groups and that they should be permitted to proceed with this process in accordance with their business judgment rather than at the whim of the other contract parties. They assert that HHC has failed to establish any compelling reason why the Debtors should deal with their contract first.

### A. Breach of Contract

#### 1. Pre-petition breaches

At trial, HHC presented testimony of numerous allegations of default of the PMA by the Debtors. However, each allegation was refuted by testimony presented by the Debtors. Essentially, HHC asserts that the management services being performed by the Debtors under the PMA are the same services which HHC did itself with the same employees and same assets before the PMA was executed. However, the PMA itself contemplated that many of the services would continue to be performed by the same individuals, who became employees of the Debtors. HHC asserted that it had expected additional services because of the Debtors' purported expertise in the area. However, HHC could point to no obligation under the PMA that the Debtors were not performing.

In contrast, the Debtors presented evidence of additional work being performed by their employees for HHC, particularly in the accounting area. Although HHC stated that it does not find the financial statements prepared by the Debtors to be helpful, it did not dispute that those statements were being prepared. Further, HHC conceded that the Debtors had presented it with an opportunity to participate in an oncology trial, which HHC had declined.

HHC asserted that, under the PMA, they transferred ownership in their own equipment and accounts receivable to the Debtors, without any investment by the Debtors in their practice group. This was refuted by the Debtors, who presented testimony that they purchased in excess of $600,000 in new equipment for HHC. In addition, the Debtors testified that they did honor their obligations to HHC by using the accounts receivable generated by the practice group to cover all its expenses, although under the PMA the accounts receivable belong to the Debtors. In fact, the Debtors testified that, according to their records, there is owed over $860,000 to the Debtors under the PMA which reflects that they have been exceeding their obligations to HHC.

The Debtors also presented compelling evidence to refute HHC's allegations that the Debtors have been in default of the PMA since it was executed in 1997. In August, 2000, the PMA was amended by the parties to increase the management fee that HHC was to pay to the Debtors from $367,500 to $750,000 per year. (*See* Exhibits M–1 and M–2.) This change was made at the suggestion of HHC, in exchange for the issuance of additional stock of the Debtors to HHC and HHC's right to terminate the agreement early. (*See* Exhibit R–1.) The Debtors posit that, if the Debtors were in default of the PMA, HHC would not have agreed to increase the management fees it was paying to the Debtors.

We agree with this conclusion. The amendment was executed by the parties after the Debtors were allegedly in default (HHC asserts that the Debtors have been in default of the PMA since it was executed). There is no suggestion in the amendment that the Debtors were in default; in fact, the agreement by HHC to increase

the management fees it was paying (and to increase its stock in the Debtors) suggests the contrary.

Further, even if HHC had established a pre-petition default of the PMA, that fact would not be a reason to compel the Debtors to decide more quickly whether to assume or reject the contract. If there were a breach of the PMA pre-petition, HHC would have a claim for that breach. If the Debtors determined to assume that contract, they would be obligated to cure any defaults or provide adequate assurance that the defaults would be cured. 11 U.S.C. § 365(b)(1). If the Debtors determined to reject the contract, HHC would simply have a pre-petition claim for the default. 11 U.S.C. § 365(g)(1).

■ We find insufficient evidence of any pre-petition breach of the PMA by the Debtors. Further, we conclude that, even if the Debtors were in default of the PMA pre-petition, it is not a legally cognizable reason to compel the Debtors to decide on an expedited basis whether to assume or reject that agreement.

### 2. *Post-petition breaches*

With respect to the allegations of cost-petition continuing breach of the PMA, we do not find convincing evidence that the Debtors are not performing under that contract.[2] Until the bankruptcy petition was filed, HHC appears to have been satisfied with the Debtors' performance, as evidenced by the lack of any notice of default and by the fact that HHC entered into an amendment whereby it agreed to pay more in management fees. HHC has presented no convincing evidence of a change in the Debtors' performance of the PMA post-petition. Every allegation of post-petition

breach was met with convincing testimony by the Debtors of performance.

■ It appears that HHC is now simply dissatisfied with the bargain it struck with the Debtors, which gave it stock in the Debtors (apparently worthless now that the Debtors are in bankruptcy). However, this is no reason to grant the relief requested. As the Court in *Wheeling–Pittsburgh Steel* concluded in similar circumstances: "[The non-debtor] cannot be permitted to extricate itself from what it now apparently finds to be an unfavorable agreement by forcing [the debtor] to precipitously assume or reject the Lease Agreement when [the non-debtor] is receiving precisely what it bargained for." 54 B.R. at 389.

We find insufficient evidence of a post-petition breach of the PMA to compel the Debtors to make an earlier decision on whether to assume or reject the contract.

### B. *Settlements with other Practice Groups*

HHC asserts that, given the settlements that the Debtors are negotiating with other practice groups, and the fact that its PMA may be terminated in May, 2002, it is clear that the Debtors will reject its PMA. Therefore, HHC asks that we compel the Debtors to do so quickly, thereby saving HHC the $62,000 management fee it pays the Debtors each month.

The Debtors acknowledge that they are negotiating with other practice groups. However, they assert that these negotiations are occurring in the context of the Debtors' overall assessment of the market and their business plan. They ask for sufficient time to make a reasoned analy-

---

**2.** Some courts have held that even a post-petition breach of an executory contract is not sufficient cause to compel a debtor to assume or reject the contract before confirmation. *See, e.g., In re El Paso Refinery, L.P.,* 220 B.R. 37, 44 (Bankr.W.D.Tex.1998) (*quoting Krafsur v. UOP (In re El Paso Refinery, L.P.),* 196 B.R. 58, 72 (Bankr.W.D.Tex.1996)).

sis. While the Debtors acknowledge that they do have to divest some of their practice groups in order to reduce their debt level, they state that the determination of which groups to divest involves numerous business factors and should not be reliant on which practice group wants to have its contract dealt with first. In the interim, the Debtors testified that the fees being received from HHC represent 15% of their revenues and are necessary for their cash flow while in bankruptcy, if not for their successful emergence from bankruptcy.

We agree with the Debtors that HHC has failed to establish a compelling reason for the Debtors to decide whether to assume or reject its contract now. The Debtors are performing under the contract. The Debtors are evaluating and analyzing their businesses and making progress in deciding which contracts to keep and which to divest.[3] The bankruptcy case is only five months old. There is no evidence that the Debtors are being dilatory in addressing these issues, which must be resolved before a plan of reorganization can be filed. Further, there is no evidence that HHC is being prejudiced by the delay in the Debtors' decision. *Cf. In re Taber Farm Assoc.*, 115 B.R. 455, 457 (Bankr.S.D.N.Y.1990) (court granted debtor an additional 120 days to decide whether to assume or reject contract, even though other party to the contract was receiving no income and was unable to sell its land until the debtor's decision was made).

---

**3.** As of the hearing, the Debtors had already filed ten motions for approval of settlements with practice groups.

**4.** HHC also asserts that the Third Amendment to the PMA gave it the right to terminate early and to acquire back its equipment in exchange for the Debtors' stock. It fears that the Debtors will eliminate this right by reject-

The desire to be first is not a convincing reason to compel the Debtors to accelerate their decision. *See, e.g., Public Svc. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Svc. Co. of New Hampshire )*, 884 F.2d 11, 14–15 (1st Cir. 1989) ("interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many"); *Hiser v. Blue Cross of Greater Philadelphia (In re St. Mary Hosp.)*, 89 B.R. 503, 513–14 (Bankr.E.D.Pa.1988) (after balancing the respective harms to the debtor and other contracting party, the court concluded that "the interests of the Debtor here in denying a precipitous assumption or rejection appear to us much greater than the interests of HHS in forcing a prompt resolution").

■ HHC also asserts that, since it can terminate the agreement in May, 2002, there is no possibility of a long term relationship with the Debtors.[4] While this may be true, it is irrelevant to a determination of whether to compel the Debtors to assume or reject the agreement. Section 365 applies to all executory contracts, regardless of the length of time left on the contract.

### III. *CONCLUSION*

For the foregoing reasons, we deny the motion of HHC to compel the Debtors to assume or reject its PMA.

An appropriate order is attached.

ing the PMA. It does not dispute the Debtors' right to reject the contract but complains about paying the Debtors $750,000 in management fees between now and May, 2002, when it knows the Debtors will ultimately reject the PMA. However, the Debtors note that to obtain the management fees, they will have to continue to perform under the PMA.

## ORDER

AND NOW, this **9TH** day of **MAY, 2001,** upon consideration of the Motion of HHC Medical Group, Inc. to compel the Debtors to Assume or Reject the Practice Management Agreement between the Debtors and HHC, it is hereby

**ORDERED** that the Debtors' Motion is **DENIED.**