**In re KMART CORPORATION, et al., Debtors.**

No. 02 B 02474.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 23, 2003.

**616**

Gary E. Green, William Kent Carter, Coston & Lichtman, Chicago, IL, for CIT Financial USA, Inc.

John Wm. Butler, Jr., J. Eric Ivester, Mark A. McDermott, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for debtors.

### MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter comes before the Court on the Motion of CIT Financial USA, Inc. ("CIT") for a Court Order Compelling Debtor–in–Possession to Assume or Reject the Licensing Agreement and for Administrative Claim.

### I.

### BACKGROUND

Kmart Corporation ("Kmart") and 37 of its affiliates filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 22, 2002 (the "Petition Date"). Kmart continues to operate its business and manage its properties as a debtor in possession pursuant to section 1107(a) of the Bankruptcy Code. Kmart uses various software programs to assist in the maintenance and management of the numerous tasks and duties pertinent to its business operations.

On or about September 12, 1992, Kmart as licensee, and Platinum Technology, Inc. ("PTI"), as licensor, entered into a License Agreement under which PTI was to install designated software for Kmart in accordance with a related Master Product License Agreement. The product, known as the Platinum Plan Analyzer, is a software tool that "aids in physical database design, performance tuning, and application development . . ." (*See* Equipment Purchase Order No. C1727 Dated 09/04/1992). PTI was later acquired by Computer Associates ("CA"), who is the service provider under the License Agreement. In exchange for PTI's services, Kmart agreed to pay $375,000 plus applicable state taxes, in five equal annual payments, with the first payment due on April 30, 1999.

Kmart acknowledges that the License Agreement contemplated that the payments, together with all related rights of PTI would be assigned to Platinum Technology Financial Services ("PTFS"). PTFS subsequently assigned its rights to CIT. CA remains obligated to Kmart to provide the products, warranties, maintenance and support specified in the License Agreement. CIT is responsible for paying twenty percent (20%) of the license fee it receives from Kmart to CA for maintenance on the product.

CIT received its last payment from Kmart in May 2001. Kmart has not made the annual payment due April 30, 2002.

On July 10, 2002, CIT filed this motion to compel Kmart to assume or reject the

License Agreement and for the allowance of an administrative claim. CIT's motion was initially presented at the omnibus hearing on July 25, 2002. At the July 25th hearing, Kmart's counsel advised the Court that the parties agreed to continue the motion for hearing at the August omnibus date and at that hearing they would either advise of a settlement or proceed with a short evidentiary hearing. On August 7, 2002, the Court entered an order scheduling a hearing on the motion for August 29, 2002.

In its objection, as discussed in detail later, Kmart argues that the License Agreement is not an executory contract subject to assumption or rejection. CIT argues otherwise and urges the Court to enter an order compelling Kmart to assume or reject the License Agreement. Whether there is cause for that relief depends upon whether the License Agreement is an executory contract. The Court will therefore address that issue first.

## II.

### *DISCUSSION*

#### A. *Is the License Agreement an Executory Contract?*

■ The Bankruptcy Code does not define the term "executory contract." The legislative history in the Congressional reports states that " ... the concept [of an executory contract] generally includes contracts on which performance remains due to some extent on both sides." *In re Resource Technology Corp.*, 254 B.R. 215, 222 n. 3 (Bankr.N.D.Ill.2000) (*quoting* H.R.Rep. No. 95–595 at 347 (1977); S.Rep. No. 95–989 at 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6303, 6304, 5787, 5844). Also, the background and purpose of section 365 indicate that "executory contracts" are those that present the estate with a "mixed blessing"—potential

contractual benefits that can only be obtained at the cost of the debtor's performance under the contract. *Id.* at 216.

■ "Congress intended that § 365 apply to contracts where significant unperformed obligations remain on both sides." *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989) (*citing* V. Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn.L.Rev. 439, 460 (1974), which defines an executory contract as an agreement where "the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."). Under Countryman, a contract that has been fully performed on either side is not executory.

Consistent with the understanding of "executory" outlined above, the dispute here has focused on the question of Kmart's remaining contractual obligations under the License Agreement. Kmart argues that its only remaining obligation is to pay the annual purchase price, which was incurred prepetition and is being paid on an installment basis. Kmart claims that it has substantially performed all of its obligations under the License Agreement—i.e., that no substantial performance by Kmart remains conditional on licensor's performance—and that an installment sale was effectuated. CIT argues that its performance, as well as Kmart's, under the License Agreement is ongoing and substantial.

Arguments of this nature have been addressed in a number of decisions, all of which present a variation on the same theme—the estate argues that some asset was transferred to the debtor prepetition, and that whatever consideration that remains owing from the debtor for the asset is simply an unsecured prepetition claim

against the estate. The other party to the contract contends that it has not completed any transfer, but is involved in an ongoing contract, which the estate must assume if it wishes to retain the benefits being received. In the face of such a dispute, to determine whether the contract is executory, the court must examine the unperformed duties and obligations of each party.

■ The type of contract involved here is a license agreement. "Generally speaking, a license agreement is an executory contract as such is contemplated in the Bankruptcy Code." *In re Novon Intern. Inc.*, 2000 WL 432848, *4 (W.D.N.Y. March 31, 2000). A license agreement can impose any number of on-going performance obligations on the parties, including responsibilities relating to reporting, labeling, policing, service, maintenance, and technological upgrades. Gleich Primoff, M. *e-Commerce and Dot.com Bankruptcies: Assumption, Assignment and Rejection of Executory Contracts, Including Intellectual Property Agreements and Related Issues under Sections 365(c), 365(e) and 365(n) of the Bankruptcy Code*, 8 Am. Bankr.Inst. L.Rev. 307 (Winter, 2000). The contingency or remoteness of the obligations imposed by a license agreement does not prevent an agreement from being deemed executory in nature. *Id.* at 317.

■ In this matter, Article 8 of the License Agreement sets forth ongoing requirements on the part of Kmart. For example, Kmart has a continuing duty to notify CA in writing of any claims, allegations of infringement, or legal suits that may arise. Kmart also has a duty to protect the confidential nature of the software's trade secrets, a duty to seek consent if Kmart wishes to transfer the software to someone else, and if CIT consents to any such transfer, Kmart must execute a new Product Schedule for each licensed product. Further, and most importantly, Kmart *continues to use* the software under the License Agreement. This aspect of the agreement is crucial to the determination that the license agreement is an executory contract. *Id.* at 319. CIT's obligations are ongoing as well, as CIT continues to pay CA to continue to provide service, maintenance, and upgrades on the software that was licensed to Kmart under the License Agreement. *See* Section 6 of the License Agreement.

Kmart analogizes the licensing fees it owes to installment payments and recasts the License Agreement as a promissory note. Under the License Agreement, Kmart agreed to pay five equal annual payments of $75,000 beginning in 1999, in lieu of making a lump sum payment of $375,000. These installment payments are described as a "Finance Option" in section 9 of the License Agreement. Under the Finance Option, "Customer [Kmart] elects to finance its acquisition of the License ..." This arrangement, argues Kmart, effectuated an installment sale, similar to a promissory note that is due over time because the software covered by the License Agreement has already been delivered to Kmart, and the only outstanding obligations on the part of Kmart under the License Agreement are two installment payments. Thus, according to Kmart, the License Agreement is not an executory contract. This interpretation, however, ignores the continuing obligations on the part of Kmart and CIT and mischaracterizes the license fees, inaccurately reflecting the reality of the License Agreement because no transfer of ownership has occurred as between the parties.

Next, the license granted to Kmart under the License Agreement is non-exclusive. A non-exclusive license typically grants a licensee the mere right to use certain intellectual property; the licensor

retains the rights and remedies associated with ownership of the intellectual property. An exclusive license to use intellectual property, by contrast, may transfer title or ownership to the subject intellectual property. Accordingly, an exclusive intellectual property license would be more likely to constitute a sale because an exclusive license confers upon the licensee (and divests the licensor of) all or some portion of the ownership rights and interests associated with the intellectual property pursuant to well-established principles of patent, copyright and trademark law. *Id.* at 317–18.

Kmart contends that it was granted a perpetual license which in turn effectuated an ownership right in the software. However, Article 8 of the License Agreement clearly spells out the non-exclusive nature of the grant and Kmart's mere right to use, not own the software.[1] This is not a transaction possessed of the simple characteristics inherent to an installment sale, as Kmart contends. Also, the mutual obligations as set forth in the License Agreement transcend those of a mere series of money payments. Section 9 simply allows Kmart to pay its licensing fees over time as a matter of convenience.

Finally, case law holds that license agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code. *See In re Superior Toy & Mfg. Co. Inc.,* 78 F.3d 1169 (7th Cir.1996) (holding trademark license executory); *Novon Intern.,* 2000 WL 432848 (viewing patent license as executory); *In re Catapult Entertainment, Inc.,* 165 F.3d 747 (9th Cir.1999), *cert. dismissed* 528 U.S. 924, 120 S.Ct. 369, 145 L.Ed.2d 248 (1999) (recognizing patent license as executory).

Since substantial obligations and duties remain incumbent on both parties, the Court finds that the License Agreement is an executory contract for purposes of section 365 of the Bankruptcy Code. The question now is whether Kmart should be compelled to assume or reject the License Agreement before plan confirmation.

**B.** *Compelling Assumption or Rejection*

■ The Bankruptcy Code allows a debtor until plan confirmation to decide whether to assume or reject an executory contract. 11 U.S.C. § 365(d)(2). A non-debtor party to an executory contract can file a motion with the court and request the entry of an order compelling the debtor to make its decision prior to plan confirmation. *Id.* Section 365(d)(2) does not establish express standards by which the determination to compel assumption or rejection prior to plan confirmation is to be made. In making this determination, the court does not abuse its discretion by considering the interests of the nondebtor party pending the debtor's decision to assume or reject. *In re Whitcomb & Keller Mortg. Co., Inc.,* 715 F.2d 375, 379 (7th Cir.1983).

Permitting the debtor to makes its decision as late as the plan confirmation date enables the debtor to carefully evaluate the possible benefits and burdens of an executory contract. *In re Wheeling–Pittsburgh Steel Corp.,* 54 B.R. 385, 388 (Bankr. W.D.Pa.1985). The Seventh Circuit notes,

> Since a debtor is in limbo until confirmation of a plan, it is understandably difficult to commit itself to assuming or rejecting a contract much before the time for confirmation of a plan ... This procedure insures that the debtor is not in the precarious position of having as-

---

**1.** "Title and full ownership rights in PRODUCT remain with LICENSOR." Article 8 of License Agreement.

sumed a contract relying on confirmation of a particular plan, only to find the plan to have been rejected.

*Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1215 (7th Cir.1984), *cert. denied* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984) (*quoting Data–Link Systems, Inc. v. Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 378 (7th Cir.1983)).

■ Courts rarely force a debtor into assuming or rejecting a contract. *See Id.* at 1216 (to rush the debtor into what may be an improvident decision "to assume or reject an executory contract does not further the purposes of the reorganization provisions."). The reason for the reluctance is that the "interests of the creditors collectively and the bankruptcy estate as a whole will not yield easily to the convenience or advantage of one creditor out of many." *See In re Public Service Co. of New Hampshire*, 884 F.2d 11, 14–15 (1st Cir.1989), *Wheeling–Pittsburgh*, 54 B.R. at 388, *see also In re Physician Health Corporation*, 262 B.R. 290 (Bankr.D.Del.2001) (denying motion compelling assumption or rejection of executory contract when bankruptcy case was only five months old) and *In re St. Mary Hosp.*, 89 B.R. 503, 513–14 (Bankr.E.D.Pa.1988) ("the interests of the Debtor here in denying a precipitous assumption or rejection appear to us much greater than the interests of HHS in forcing a prompt resolution.").

■ In this case, CIT continues to incur additional risk and economic liability without receiving the performance from Kmart agreed upon under the License Agreement. CIT is being harmed because of Kmart's failure to make the April 2002 payment and CIT's fronting of the maintenance fee.

On the other hand, there is nothing to indicate that Kmart's reorganization plans are dependent upon Kmart making a decision on the License Agreement prior to plan confirmation. *Compare Resource Tech.*, 254 B.R. at 227 (Court did not abuse its discretion in shortening deadline to assume or reject, where it was demonstrated that the contract at issue was "the cornerstone of the proposed reorganization" and interested parties were entitled to know whether the contract would be assumed, because if it was not, the parties would have to "pursue a different course of conduct in [the] case.")

The Court finds that Kmart will be harmed if it is forced to decide now whether to assume or reject the License Agreement. Forcing Kmart will prematurely box Kmart into focusing its attention and resources on one contract over a multitude of contracts. Moreover, as a general proposition it is unrealistic and imprudent to require Kmart to make decisions on executory contracts in a vacuum on a piecemeal basis. This is particularly true in a bankruptcy case of this magnitude and complexity that has only reached its first anniversary. In summary, CIT has not convinced the Court that cause exists to shorten the time for Kmart to determine whether the assumption or rejection of the License Agreement would be beneficial to an effective reorganization. *See Whitcomb*, 715 F.2d at 379. Accordingly, the Court denies the request of CIT to compel an assumption or rejection of the License Agreement.

## C. *CIT's Request for an Administrative Claim*

CIT also requests that the Court allow an administrative claim in favor of CIT pursuant to section 503(b) of the Bankruptcy Code, which would result in the claim being entitled to first priority distribution under section 507 of the Bankruptcy Code.

Section 503(b) of the Bankruptcy Code provides, in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

■ Administrative priority claims are to be strictly construed because of the presumption that the debtor has limited resources to equally distribute among creditors. *See In re Amarex*, 853 F.2d 1526, 1530 (10th Cir.1988) and *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976) ("To give priority to a claimant not clearly entitled thereto is inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer.")

■ The policy underlying priority treatment for administrative expenses is to encourage creditors to deal with the debtor in possession and thereby support the reorganization effort. *In the Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984). To that end, the subject debt will be afforded priority under section 503 of the Bankruptcy Code if it both (a) arises out of a transaction with the debtor in possession; and (b) is beneficial to the operation of the debtor in possession's business. *Id.*

■ The claimant has the burden of proving entitlement to an administrative expense by preponderance of the evidence. *In re Party Masters, Inc.*, 1992 WL 106259 (Bankr.N.D.Ill. April 23, 1992). The claimant must demonstrate that the benefit is more than a speculative or potential benefit. *In re Paula Lickman*, 273 B.R. 691, 704 (Bankr.M.D.Fla.2002). It is not

enough that the debtor remains in possession of the subject matter of the agreement. *Kinnan & Kinnan Partnership v. Agristor Leasing*, 116 B.R. 162, 166 (D.Neb.1990). Rather, the benefit must be "an actual, concrete benefit for the estate before a claim is allowable ... as an administrative expense." *Id. (quoting In re Subscription Television of Greater Atlanta*, 789 F.2d at 1532). Finally, the claimant must establish that the estate was benefitted as a whole. *In re Pettibone Corp.*, 90 B.R. 918, 933 (Bankr.N.D.Ill. 1988).

■ Once the claimant establishes that an actual benefit was conferred upon the estate, the court has discretion to determine the reasonable value of the administrative claim. *In re Englewood Community Hosp. Corp.*, 117 B.R. 352, 358 (Bankr.N.D.Ill.1990). The Supreme Court, in *dicta*, has stated that if the debtor in possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor in possession is obligated to pay for the reasonable value of those services, which depending on the circumstances of a particular contract may be what is specified in the contract. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)(*citing Philadelphia Co. v. Dipple*, 312 U.S. 168, 312 U.S. 656, 61 S.Ct. 538, 85 L.Ed. 651 (1941)). While the contract rate is an appropriate method for the court to arrive at the amount of the administrative claim, other factors may be pertinent as well, such as the actual amount of services provided to the debtor in possession. *See* William L. Norton, Jr., 4 Norton Bankruptcy Law and Practice 2d ed. § 42.20 (2002).

■ In this matter, CIT has failed to meet its burden to establish a clear entitle-

ment to an administrative claim. As stated earlier, the motion was scheduled for an evidentiary hearing on August 29, 2002. CIT only introduced the License Agreement into evidence in support of its request for allowance of an administrative expense. CIT did not introduce evidence which would demonstrate any concrete, actual postpetition benefits conferred upon the estate as a whole.

CIT's counsel stated at the hearing in response the Court's question as to whether service, maintenance and upgrades were being provided to Kmart, "Yes, Computer Associates is a vendor of ours who is providing that service. So there is. I mean, I can't tell you as I sit here today how many times Kmart has called Computer Associates on a technical question, how many times they have called and said: 'Let's do the upgrades,' *et cetera, et cetera.*" (Transcript of August 29, 2002 hearing, page 83). Additionally, CIT's counsel indicated that he would submit an affidavit from an individual at Computer Associates to the effect that services were given to Kmart. (*Id.* at page 97). To date, the Court is not in receipt of such an affidavit nor does a review of the voluminous docket in the case reveal any such affidavit being filed. Given the scarcity of the evidence, the only way the Court could conclude that the estate as a whole realized or is realizing a tangible benefit would be to engage in speculation. The allowance of an administrative claim should not be an exercise in conjecture. Therefore, the Court denies CIT's request for allowance of an administrative expense claim.

### III.

### *CONCLUSION*

For the reasons stated herein, the Court denies the motion of CIT Financial USA, Inc. for the entry of an order pursuant to

section 365(d)(2) of the Bankruptcy Code compelling Kmart Corporation to assume or reject a certain license agreement and for an administrative claim pursuant to section 503(b) of the Bankruptcy Code.