**In re UAL CORPORATION, et al., Debtors.**

**United Air Lines, Inc., Plaintiff,**

**v.**

**U.S. Bank Trust National Association as Trustee, SunTrust Bank as Trustee, BNY Midwest Trust Company as Trustee, HSBC Bank USA as Trustee, and the City of Chicago, Defendants.**

**Bankruptcy No. 02 B 48191, Adversary No. 03 A 03927.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 21, 2006.

458

James H.M. Sprayregen, Marc Kieselstein, David R. Seligman, Erik W. Chalut, Todd Gayle, Kirkland & Ellis LLP, Chicago, IL, for United Air Lines, Inc.

Keith J. Shapiro, Francis A. Citera, Matthew T. Gensburg, Matthew F. Prewitt, Greenberg Traurig, Chicago, Diane M. Pezanoski, Esther E. Tryban Telser, Chicago, IL, for City of Chicago.

Fruman Jacobson, Patrick C. Maxcy, Sonnenschein, Nath & Rosenthal, Chicago, IL, Carole Neville, Mark A. Fink, Sonnenschein, Nath & Rosenthal, New York, NY, for Committee.

Stephen Wolfe, Chicago, for the United States Trustee.

Mark E. Leipold, Mark E. Abraham, Gould & Ratner, Chicago, IL, Patrick J. McLaughlin, Katherine A. Constantine, Steven J. Heim, Dorsey & Whitney, Minneapolis, MN, for U.S. Bank N.A.

Paula Jacobi, Sugar Friedberg & Felsenthal; David L. Dubrow, Arent Fox Kintner Plotkin & Kahn, New York, NY; Carol Connor Flowe, Caroline Turner English, Arent Fox Kintner Plotkin & Kahn, Washington, D.C., for SunTrust Bank.

William P. Smith, Paul E. Chronis, Nathan F. Coco, Kristin L. Cantu, McDermott Will & Emery, Chicago, IL, for BNY Midwest Trust Company.

Harold Kaplan, Gary W. Garner, Mark Hebbein, Gardner Carton Douglas, Chicago, IL, William W. Kannel, Timothy J. Langella, Mintz, Levin, Cohn, Ferris, Glovsky, Popeo, Boston, MA, for HSBC Bank USA.

### MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This adversary proceeding is before the court for the entry of judgment after trial.

The proceeding was brought by United Air Lines, Inc. ("United"), a Chapter 11 debtor in possession. United seeks a declaratory judgment as to the effect in bankruptcy of a provision in its Airport Use Agreement (AUA) with the City of Chicago, governing United's use of O'Hare International Airport. Under the AUA, United has the exclusive use of defined airport terminal space, most importantly a number of boarding gates. The provision in question functions as a cross-default clause, conditioning United's exclusive use of terminal space on its performance under a separate agreement to make payments on certain bonds. Because payment of the bonds is unrelated to the City's interests under the AUA, the challenged provision cannot prevent assumption of the AUA pursuant to § 365(a) of the Bankruptcy Code (Title 11, U.S.C.). Accordingly, judgment will be entered in favor of United.

### Jurisdiction

District courts have exclusive jurisdiction over bankruptcy cases, pursuant to 28 U.S.C. § 1334(a), and they have concurrent jurisdiction over all civil proceedings "arising in" bankruptcy cases, pursuant to 28 U.S.C. § 1334(b). A proceeding to determine whether a contractual provision is enforceable under § 365 of the Bankruptcy Code "arises under" the Code, and so is within the district court's jurisdiction. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) ("Congress used the phrase 'arising under title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11.").

Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. Proceedings "arising under" the Bankruptcy Code are core proceedings. *Wood*, 825 F.2d at 96. This court accordingly may enter a final judgment in this proceeding.

### Findings of Fact

Although the parties presented substantial documentary and testimonial evidence at the trial in this proceeding, most (though not all) of the relevant facts are undisputed.

*Undisputed facts*

This proceeding arises out of two agreements involving Chicago O'Hare International Airport ("O'Hare") between the City of Chicago ("the City"), which owns and operates O'Hare, and United, which has major operations at O'Hare. One of the agreements requires United to make payments on bonds issued in connection with the construction of airport improvements; the other governs United's use of space at the airport.

*The bond payment agreements.* Between 1999 and 2001 the City issued several series of revenue bonds, in a total amount exceeding $600 million. The proceeds of these bonds were used to retire 1984 bond issues that had financed improvements at O'Hare for United's benefit. Each series of the 1999–2001 bonds is governed by a bond indenture entered into between the City and an indenture trustee. (See, e.g., Indenture of Trust for Series 1999A Bonds, the "1999A Bond Indenture," included as part of Exhibit 3 to United's Adversary Complaint.) All of the bonds in the 1999–2001 series are without recourse to the City and are unsecured. The only source of principal and interest payments on the bonds is United.

United's obligation to make the bond payments is set out in a series of bond payment agreements—one for each series of bonds—titled "Special Facility Agreements." (See, e.g., Special Facility Use Agreement for Series 1999A Bonds, the "1999A Special Facility Agreement," also included as part of Exhibit 3 to United's Adversary Complaint.) [1]

The general operation of the bond payment agreements—all of which have substantially similar terms—is illustrated by the 1999A Special Facility Agreement. The agreement provides in § 5.1 for United (referred to as "the Company") to make all of the payments on the 1999A series bonds. It then states:

> All amounts payable under this Section 5.1(a) by the Company are assigned by the City to the Trustee pursuant to the Indenture for the benefit of the Bondholders. The Company consents to such assignment. Accordingly, the Company will pay directly to the Trustee at its principal corporate trust offices all payments payable by the Company pursuant to this Section.

The agreement goes on to provide for an assignment to the indenture trustee of all of the City's rights under the agreement, except for rights to indemnification and to payment of fees and expenses incurred by the City in issuing the bonds. (See 1999A Special Facility Agreement § 8.2 (providing for an assignment by the City of all but defined "Unassigned Rights"); 1999A Bond Indenture § 1.01 (defining "Unassigned Rights" as including only specified rights of the City to indemnity, fees, and expense reimbursement).) Conversely, § 5.5 of the 1999A Special Facility Agreement, with the heading "No Liability of City," states that the bonds will "give rise to no pecuniary liability of the City nor a charge against its general credit or taxing powers and shall be payable by the City solely out of the amounts payable by Company."

Finally, the agreement provides that the indenture trustee has the exclusive right to enforce United's payment obligations on the bonds. Thus, § 9.1(a) of the 1999A Special Facility Agreement states that in the event of a default under the corresponding bond indenture, "the Trustee may ... take whatever action as may appear necessary or desirable to collect the payments then due or to become due or to enforce performance of any agreement of the Company in this agreement." On the other hand, the same section of the agreement provides that the City's enforcement rights on default extend only with respect to the "Unassigned Rights."

Thus, the impact of the bond payment agreements is to place on United the sole obligation to pay the bonds issued by the City on United's behalf and to give the indenture trustees the sole right to enforce that payment obligation.

United stopped making payments on the bonds after its bankruptcy filing. Ultimately, United and the indenture trustees entered into an agreement under which United would provide consideration under its Chapter 11 plan "in full and complete settlement of all claims and controversies that the [indenture] Trustees and [bond] Holders may now or hereafter have against United ... in any manner relating to the Bonds." (Settlement Agreement of Dec. 17, 2004, ¶ 3, approved by and attached to Order of Feb. 15, 2005.) Upon entry of the order approving the settle-

---

1. The bond indentures and bond payment agreements reflect that the City issued the bonds, instead of United, so that the interest on the bonds could be excluded from income for federal tax purposes. See, e.g., 1999A Special Facility Agreement § 6.4 (United agrees not to take action that would result in the loss of tax exempt status).

ment, United's obligations under the bond payment agreements ceased. (*Id.* at ¶ 12(c).) United's Chapter 11 plan, incorporating the bond payment settlement, was confirmed on January 20, 2006.

*The Airport Use Agreement.* The bond indentures and bond payment agreements described above do not provide United with any right to use facilities at O'Hare. Rather, United's right to use O'Hare facilities—and specifically its right to gates at the airport—is governed by an "Airport Use Agreement" (United Trial Ex. 1, the "AUA").[2]

The AUA was executed in 1985, fourteen years before the first of the bond indentures and bond payment agreements discussed above, at the same time that the City executed substantially similar agreements with other airlines using O'Hare. (See City Trial Ex. 49–53, Airport Use Agreements with American Airlines, Delta, Continental, Northwest, and USAir, respectively.) The AUA is a complex document—with attachments and amendments more than 200 pages long. However, its general operation is clear: the AUA requires United to contribute a ratable share of the expenses of operating the airport in exchange for (1) the right, shared with other airlines, to use runways and other common areas of the airport, and (2) the exclusive right to use a number of gates and related terminal space.

The specific provisions of the AUA relevant to this dispute can be outlined as follows:

Article I sets out definitions, including a definition of "Exclusive Use Premises" in § 101(32), that makes clear that such premises are "leased to [United] for its exclusive occupancy and use."

Article II provides that the agreement has a term ending on May 11, 2018. (AUA § 2.01.)

Article III sets out the use and occupancy rights that the City grants to United. These include varying rights to three distinct areas of the airport:

● For the airfield and aircraft parking areas, United—together with other airlines—is allowed "to perform all operations and functions" that are "incidental, necessary or proper" to the conduct of an air transportation business. (AUA § 3.01(a).)

● For its "Exclusive Use Premises"—defined terminal and concourse areas, including boarding gates—United's permitted activities encompass "any and all purposes reasonably necessary, convenient or incidental to the conduct ... of an Air Transportation Business," specifically including "the enplaning and deplaning of passengers," to the exclusion of other airlines. (AUA § 3.03(a)(ii).)

● And for the public areas of O'Hare, United's employees, agents, passengers and guests are granted the right of use in common with others. (AUA § 3.04(a).)

Article IV of the AUA defines the terminal and concourse areas that are leased to United as "Exclusive Use Premises" and states the number of square feet in such areas for which United will pay "Terminal Area Rentals and Terminal Area Use Charges." (See, e.g., AUA § 4.02.)

Articles V through XIV set out provisions for apportioning the total costs of developing and operating O'Hare through rental payments and fees among the airlines using the airport. (*See, e.g.,* AUA § 5.01, providing that "the aggregate of all

---

**2.** An airport "gate" includes both the space next to a terminal at which an aircraft parks in order to load and unload passengers and the "hold rooms," within the terminal, con-

nected to the parking space, where the passengers wait for boarding. See United Trial Ex. 2 at 2 n. 2.

rental, fees and charges to be paid under all Airport Use Agreements by all Airline parties shall be sufficient to pay for the net cost of operating, maintaining and developing the Airport.") The rent paid for exclusive use areas is fixed at $5.00 per square foot, whereas other "terminal area use charges" are variable, depending on airport expenses. (AUA §§ 5.02–5.04.)

Article XXII gives United the right to sublease or assign its Exclusive Use Premises. (AUA § 22.01, providing that the right to sublease less than all of the premises is subject to approval of the City, "which approval shall not reasonably be withheld").

Articles XXIV and XXV provide for termination of the AUA by the City and United, respectively. Among the grounds for termination by the City is United's failure to pay amounts due under the AUA (AUA § 24.01(a)) and "[t]he admission by [United] of insolvency or bankruptcy or the inability of [United] to pay its debts as such debts become due" (AUA § 24.01(c)).

The AUA concludes with Article XXVII, setting forth a set of miscellaneous provisions governing matters such as notice, severability, and limitation of waivers. (AUA §§ 27.02–27.04.) The first section of Article XXVII, § 27.01, provides that the City will not treat any other airline more favorably than United, so as to put United at a competitive disadvantage.

The final section of Article XXVII, § 27.08, is the provision in dispute in this proceeding. It states, in full:

Section 27.08 Provisions Relating to Special Facility Agreement

(a) If Airline is obligated, at any time, to make payments of interest on, premium, if any, and principal of Special Facility Revenue Bonds, then the following shall apply:

(i) If, while any such bonds are outstanding, the agreement creating and governing such obligation of Airline (the "Special Facility Agreement") terminates or is terminated for any reason, whether or not in accordance with its terms, then this Agreement shall likewise terminate; provided, however, that nothing herein shall be deemed to terminate this Agreement if such Special Facility Agreement terminates or is terminated when no such Special Facility Revenue Bonds are outstanding; and provided further, that neither this Agreement nor any such Special Facility Agreement shall be terminated by virtue of the issuance of obligations thereunder for the refunding or refinancing of any such bonds.

(ii) Airline's continued rights to use and occupy its Exclusive Use Premises shall be conditioned upon the performance and observance by Airline of its covenants and agreements in the Special Facility Agreement; provided, however, that such condition shall not be deemed to be violated unless any period established in such Special Facility Agreement for curing any failure to perform or to observe such covenants and agreements has expired without such failure being cured.

(b) In the event that Airline and City are parties to a Special Facility Agreement dated prior to the date of execution of this Agreement, it is the understanding and agreement of City and Airline that City would not have demised and let any Exclusive Use Premises to Airline hereunder if Airline had not heretofore undertaken the duties and obligations required to be performed and observed by the Airline under the terms of such Special Facility Agreement.

Both before and after its bankruptcy filing, United made all of the payments required under the AUA. (Trial Tr. at 132–33.) United's confirmed Chapter 11 plan gives it the choice of assuming or rejecting the AUA, depending on the outcome of this adversary proceeding. (City Trial Ex. 141A at 82, ¶ E.2.)

*Gate use arrangements.* As explained in a publication of the Federal Aviation Administration, airports in this country generally allow airlines to use the airports' boarding gates under one of three arrangements: exclusive use, preferential use, or common use. (City Trial Ex. 28, "Airport Business Practices and Their Impact on Airline Competition," at 36–41.) The publication describes the three arrangements as follows:

● Exclusive-use gate arrangements remain the predominant type of airport-air carrier rental agreement among large commercial hub airports. An exclusive-use lease typically assigns to one airline the right to use and occupy gates and facilities for a specified duration and the right to sublet or assign the facilities, conditioned on the prior written approval of the airport management. (*Id.* at 38.)

● Preferential or shared-use contractual arrangements generally give the tenant airline the primary right to use the facility when it has operations scheduled. These arrangements represent a shared control between the airport and the airline tenant; the airline tenant acknowledges the airport's authority, under specified circumstances, to allow use of the leased facility by other airlines . . . . . Preferential-use leases differ in the amount of "preference" or "priority" the airport gives to the tenant. For example, some arrangements give absolute preference to the tenant airline if it meets the minimum utilization threshold. If minimum utilization criteria are not met, the leases may subject the tenant to "use-it-or-share-it" requirements or to the "use-it-or-lose-it" rule. Some preferential-use leases give the primary tenant the right to charge the secondary tenant for facility usage. (Some leases allow "bumping" rights by the primary tenant in the event it increases its operations). Some airports retain the right to recapture the facilities and reallocate excess capacity, under "use-it-or-lose-it" provisions that are not triggered by a specific minimum usage threshold. Some airports use short-term, preferential-use leases for more control. Others have the right to periodically reallocate preferential-use gates based on utilization and other factors. Minimum usage thresholds can range from three flights per day to over seven flights per day, or be based on average utilization of similar signatory carriers over a historical period. (*Id.* at 40–41.)

● Airport-controlled or common-use arrangements describe gates totally under the control of the airport. The airport may assign gates on a temporary, per-turn basis or on a short-term (e.g., 30-day) arrangement. This facilitates the airport's assignment of gates to new airlines initiating service or to established carriers expanding service. (*Id.* at 41.)

To promote competition among airlines, the U.S. Department of Transportation and the FAA have suggested that airports convert exclusive use gates to preferential use or common use. (*Id.* at i-ii, 38–39, 82–83.)

There are a total of 170 boarding gates at O'Hare. Twenty-one of these are in the international terminal and are operated on a common-use basis. (City Trial Ex. 2 at 52.) The remaining 149 gates are located in the domestic terminals and were leased in 1983 on an exclusive-use basis to various

airlines. (*Id.*) Since 1983, the City has purchased the lease of one domestic gate, which it now operates on a common-use basis. (United Trial Ex. 19 at 4.)

O'Hare is unique in that two major airlines—United and American—use the airport as a major operating hub. (*Id.*) These airlines lease the great majority of O'Hare's gates; as of June 2005, United controlled 75 gates and American controlled 65 (City Trial Ex. 21), leaving only eight gates controlled by other signatory airlines.

*Airport revenue.* As reflected in the AUA, the City allocates the operating expenses of O'Hare among the airlines that use it, allowing the airport to break even. (Trial Tr. 174–75.) The formula for this allocation is a residual cost recovery system, through which the City first deducts from its expenses the income that it receives from non-airline sources (such as parking and concessions) and then divides the remaining expense amount among the airlines, on a ratable basis, through rents and landing fees.

The cost recovery system is sensitive to the volume of flights in two ways. First, with more flights, there are likely to be more passengers using the airport's concessions, parking, and other income-generating facilities, and income from these facilities reduces the expenses shared by the airlines. Second, since landing fees are based on the weight of the aircraft landing at the airport, a larger volume of flights reduces the per-unit landing fee necessary to offset a given expense amount. Thus, if one airline substantially reduces its flight

volume, the other airlines using the airport will be required to pay higher landing fees. (Trial Tr. 166–68.) [3]

In addition to the cost recovery system, which pays for the operations of O'Hare, the City obtains income from airport operations in two other ways, also sensitive to flight volume. First, the City collects a "passenger facility charge" ("PFC") for passengers flying from O'Hare, which can be used by the City for certain capital improvements. (Trial Tr. 169–73.) [4] Second, the City charges a tax on the fuel loaded into aircraft at O'Hare. (Trial Tr. 173.) With lower flight volume, there would be fewer PFCs and lower fuel tax collections.

*Disputed facts*

The disputed facts in this adversary proceeding all involve the effect of enforcement of § 27.08 of the AUA. The evidence at trial established the following facts in this regard:

1. In the event that § 27.08 is enforceable, United will have an uncertain right to use gates at O'Hare. Nothing in the AUA specifies the consequences of a loss of United's "continued rights to use and occupy its Exclusive Use Premises" under § 27.08(a)(ii). (Trial Tr. 129.) The City prepared an exhibit for purposes of the trial in this matter, setting out an arrangement under which United could be allowed to continue to use its gates on a preferential basis. (City Trial Ex. 2 at 2.) However, this arrangement is merely a proposal from the City, subject to negotiation. (*Id.*, stating that the arrangement "provide[s] some guidance as to the terms of the

---

3. In 2004, United (including Atlantic Coast Airlines and Air Wisconsin, which operated aircraft on behalf of United) paid over $128 million toward the operating expenses of O'Hare's domestic airline operations, about 49% of the total. (Trial Tr. 172; City Trial Ex. 74.) Rent and landing fees have been

roughly equal components of the total United paid. (City Trial Ex. 102.)

4. In 2004, O'Hare's total PFC income was about $130 million, about 48% of which was generated by United passengers. (Trial Tr. 169–73.)

preferential use that United would be given," and that the City and United "would work together" to decide the actual terms.)

2. To the extent that United loses exclusive use of its gates, it will be at a competitive disadvantage. United and American Airlines each operate hubs at O'Hare and compete aggressively against one another. (Trial Tr. 76.)[5] Any loss of exclusive control over its gates at O'Hare would put United at a disadvantage in this competition. (Trial Tr. 76.) For example, depending on the alternative use terms actually implemented, United might (a) be denied access to its gates during a period of slow airline traffic and be unable to recover use of the gates when flight volume increased (Trial Tr. 92); (b) be required to accommodate other airlines at its gates during times when United's own flights were not scheduled, making the gates unavailable for use in situations of flight delays or other unscheduled needs (Trial Tr. 39–40); and (c) be unable to sublease its gates at competitive rates, because the AUA allows subleasing only of "Exclusive Use Premises" (AUA § 22.01) and because United's rights, even if assignable, would be diminished.

3. Inability to enforce § 27.08 in bankruptcy cases will have no negative effect on financing for O'Hare. An expert witness for the City testified that if § 27.08 could not be enforced in this case, the City would have difficulty issuing both "special facility" bonds, payable by individual airlines to finance improvements at O'Hare on their behalf, and "general airport revenue bonds" ("GARBs"), payable from the airport's own revenues to finance general airport improvements. (City Trial Ex. 107; Trial Tr. 199–201.)

For several reasons, this testimony was not persuasive.

First, the marketability of special facility bonds depends on the financial condition of the airline whose facilities are being financed and whose assets are the sole source for payment of the bonds. If that airline's solvency is assured, the bonds will be paid according to their terms; if the airline's solvency is tenuous, the bonds are at risk. The City's expert himself, at another stage of this litigation, recognized this fact, averring that "security for [United's] Special Facility Bonds rests solely with the financial health of United Airlines, Inc. and UAL Corp." (United Trial Ex. 50 at ¶ 19.) Thus, the recent inability of the City to issue special facility bonds for O'Hare is "primarily resultant from wholesale deterioration in the credit quality of the airlines that serve O'Hare, making an unsecured pledge for repayment of [such] bonds inadequate security for potential investors." (United Trial Ex. 25, report of United's expert, at 17.)

Second, and similarly, the marketability of GARBs depends on the anticipated airport revenues that are the source of payment for these bonds, and "there is a clear distinction between the [credit] ratings assigned to O'Hare's recourse obligations, such as general airport revenue bonds ... and the credit quality of the airlines operating at O'Hare." (*Id.* at 10.) Thus, a default by United in the payment of special facility bonds has no necessary impact on the ability of the City to issue GARBs. Indeed, following United's bankruptcy and its default in paying special facility bonds, the City's GARBs enjoyed stable or improved credit ratings, and the City has

---

**5.** Consistent with the trial testimony, a City report cites O'Hare's status as "the only true dual hub in the world" as evidence that "the Chicago Airport System is well-positioned to remain highly competitive into the foreseeable future." (United Trial Ex. 12 at 47 (ORD–1).)

successfully marketed large GARB issuances. (*Id.* at 10–11.)

Third, the question of whether the City has a right under § 27.08 of the AUA to alter United's exclusive use of airport premises if it defaults in paying special facilities bonds is irrelevant to the financial health of the entities responsible for paying either special facilities bonds or GARBs; as such, the enforceability question does not affect the City's ability to issue these bonds. (United Trial Ex. 25 at 10 (no adverse impact on GARBs from the dispute over § 27.08) and at 17 (§ 27.08 "immaterial" to the marketing of special facility bonds).) Contrary to the report of the City's expert, the bond rating agencies have not issued reports connecting this legal question to the quality of O'Hare GARBs. (United Trial Ex. 25 at 10–11, 15–18.)

4. *The volume of flights that United operates through O'Hare is not related to its compliance with the bond payment agreements.* In addition to asserting that non-enforceability of § 27.08 would impair its ability to market bonds, the City also sought to establish that non-enforceability would reduce the City's income from O'Hare. (Trial Tr. 124–26, 167–68.)

The evidence did not support this contention. The City did establish, as discussed above, that a decrease in flights from gates controlled by one airline would increase the costs of the airport borne by other airlines and would reduce the PFC and fuel tax revenue received by the City. However, no evidence established that an airline's failure to pay its special facility bonds (triggering loss of exclusive gate use under § 27.08) would result in the airline decreasing flights. To the contrary, despite its bankruptcy and bond default, United has maintained its utilization of O'Hare and "if anything [would] like to grow this market." (Trial Tr. 97–98.)

Moreover, even if United itself required fewer flights at O'Hare, there is no evidence that United would not sublease whatever gates it did not require to other airlines with which it had operating agreements. (See Trial Tr. 35–36, describing the operation of the United Star Alliance.) Conversely, an airline operating under an AUA could reduce its flights without defaulting in payment of special facility bonds, and the City would have no right to terminate the airline's exclusive use of its gates. There is no necessary connection between flight volume and special facility bond payment.

In summary, the evidence as to the disputed facts establishes:

(1) There is a potential for substantial harm to United if § 27.08 of the AUA is enforced in this case, because loss of control over its gates would put United at a disadvantage in competition with American Airlines. The extent of this disadvantage would depend on the degree of loss of control, which in turn would depend on the alternative to exclusive use that the City and United ultimately developed.

(2) Non-enforcement of § 27.08 in this case will not substantially harm the City. There is no evidence that § 27.08 has any significant effect on the marketability of bonds issued by the City or on the volume of flights at O'Hare.

## Legal Conclusions

*The cross-default rule.* From the viewpoint of the creditors of a bankrupt debtor, the debtor's executory contracts and unexpired leases are assets of questionable value-like gifts with strings attached. Such agreements confer a benefit-the continued use of property, a supply of goods or services at fixed prices, or fixed payments for the debtor's goods and services-but only at the cost of the debtor's performance. Whether an unexpired lease or executory

contract has value to the debtor's creditors depends on the balance of the benefits and costs.

■ Section 365 of the Bankruptcy Code addresses this situation by creating a framework that allows creditors to realize the value of above-market executory contracts and leases while avoiding the costs of those below-market. In broad outline, § 365 gives the administrator of the estate (the trustee or debtor in possession acting as trustee) a choice of assuming or rejecting each of the debtor's unexpired leases and executory contracts.[6] Assumption is the choice for above-market leases and contracts. It commits the estate to full performance under the contract (including cure of any defaults by the debtor) in exchange for a continuation of the counter-party's duties.[7] Moreover, an assumed lease or contract can be assigned to a third party, with a payment to the estate reflecting its excess value over the market.[8] Rejection, conversely, frees the estate from the obligation to perform an under-market contract or lease and provides the counter-party with only a non-priority unsecured claim for the resulting damages.[9]

Within this general framework, the courts have developed two complementary principles that bear on the legal question raised here:

■ First, in order to assume or reject an unexpired lease or executory contract, the trustee must deal with the agreement as a whole-*cum onere*-rather than assuming only the beneficial aspects and rejecting the burdensome ones. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *In re Shangra–La, Inc.*, 167 F.3d 843, 849 (4th Cir.1999). Thus, the trustee must generally cure all defaults in an agreement to be assumed.[10]

■ Second, in order to assume a particular executory contract or unexpired lease, the trustee is *only* required to perform under that discrete contract or lease, not under other, substantially unrelated agreements. This principle applies where distinct agreements are set out in the same document. *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir.1996) ("If a single

---

6. *See* 11 U.S.C. § 365(a). The general operation of § 365 is discussed in greater detail in *In re Resource Technology Corp.*, 254 B.R. 215, 220–21 (Bankr.N.D.Ill.2000). The trustee has an option period of variable length, depending on the type of lease or contract involved, in which to decide whether assumption or rejection is in the estate's best interest. *See* 11 U.S.C. § 365(d). The extent of the debtor's duty to perform during the option period is discussed in *In re UAL Corp.*, 291 B.R. 121, 124–26 (Bankr.N.D.Ill.2003).

7. *See* 11 U.S.C. § 365(b) (requiring cure of defaults); *In re Columbia Gas System Inc.*, 50 F.3d 233, 238–39 (3d Cir.1995) (discussing the estate's duty to perform assumed contracts).

8. *See* 11 U.S.C. § 365(f)(2)(A).

9. *See* 11 U.S.C. § 365(g).

10. A major exception to this rule is that defaults triggered by the debtor's financial condition or the bankruptcy case itself need not be cured. 11 U.S.C. § 365(b)(2). Clauses that create defaults as a result of insolvency or bankruptcy-commonly called "ipso facto clauses"-are also treated in § 365(e)(1), which states that notwithstanding such clauses, "an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case" solely because of (A) the debtor's insolvency or financial condition. (B) The commencement of a bankruptcy case, or (C) the appointment or a trustee or custodian. Section § 24.01(c) of the AUA contains a standard ipso facto clause, which the City acknowledges to be unenforceable under § 365(b)(2) and (e)(1).

contract contains separate, severable agreements the debtor may reject one agreement and not another.") And, of particular relevance here, it applies where distinct agreements are linked by a cross-default clause, providing for a loss of rights under one agreement if another agreement is breached. *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 444–45 (5th Cir.2002) (quoting *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 64 (Bankr.E.D.N.Y. 1999), in stating that, for purposes of assumption under § 365, "cross-default provisions are inherently suspect"); *In re Adelphia Bus. Solutions, Inc.*, 322 B.R. 51, 63 n. 78 (Bankr.S.D.N.Y.2005) (collecting authorities).

■■■■ Thus, as noted in *In re Convenience USA, Inc.*, No. 01–81478, 2002 WL 230772, at *2 (Bankr.M.D.N.C. Feb.12, 2002), assumption under § 365 is subject to a "well-established" cross-default rule: "[C]ross-default provisions do not integrate executory contracts or unexpired leases that otherwise are separate or severable." [11] In light of the unanimity of the reported decisions recognizing the cross-default rule and Congress's recent reenactment of the Bankruptcy Code without amending § 365 to change the rule, the cross-default rule is indeed well established. *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change …."); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (making no change to the relevant language of § 365).

*Decisions applying the rule.* Courts applying the cross-default rule have sought to determine whether agreements linked by a cross-default clause are substantially connected to one another, so that a failure to enforce the clause would deprive the

11. Many of the decisions declining to enforce cross-default clauses in the context of assumption under § 365 ground their rulings in § 365(f)(3), which invalidates contractual provisions that terminate or modify a contract or lease "on account of an assignment of such contract or lease." *In re Kopel* explains these decisions as follows:

> Although, by its terms, section 365(f) applies to invalidate provisions restricting assignment, rather than assumption, of leases, the section is relevant to the assumption inquiry because section 365(f)(2)(A) requires assumption as a predicate to assignment of a contract. Several courts have concluded that section 365(f) therefore prohibits the enforcement of a cross-default provision even where the debtor seeks only to assume, rather than to assume and assign, a contract.

232 B.R. at 64. This reasoning is not helpful; it could result in any default provision being invalidated as an anti-assignment clause under § 365(f)(3), since all defaults have to be cured as a condition for assumption and assignment.

The City views the cross-default rule differently, as an exercise of an equitable power to declare contractual provisions unenforceable in furtherance of bankruptcy policy. This analysis is also flawed, since the equitable powers of the courts in bankruptcy must be grounded in statutory provisions. "The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be." *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir.1986).

Rather than either of these analyses, the best understanding of the cross-default rule is that it, like the *cum onere* rule, defines the scope of the "executory contract or unexpired lease" subject to assumption or rejection under § 365(a). Just as the *cum onere* rule prevents the estate from avoiding obligations that are an integral part of an assumed agreement, so the cross-default rule prevents the nondebtor party from imposing on the estate the costs of substantially unrelated agreements.

nondebtor party of an essential part of its bargain.

The Fifth Circuit's *Liljeberg* decision provides an example of agreements found to be substantially interconnected. In *Liljeberg,* the debtor was part of a corporate group that constructed and owned a hospital with financing from a corporate lending group that operated hospitals. The parties entered into a series of agreements in connection with the project, including: (1) a mortgage note and mortgage of the hospital from the debtor's group to the lending group; (2) a lease of the hospital from the debtor's group to the lending group; and (3) an agreement by the lending group, which the debtor sought to assume, allowing the debtor to operate the hospital pharmacy. *Liljeberg,* 304 F.3d at 419. The debtor's group defaulted under a separate loan agreement, resulting in a judgment lien against the hospital, and the hospital was sold to satisfy the judgment. *Id.* at 420–21. The pharmacy agreement contained a cross-default clause, providing that the agreement would terminate if the debtor's group lost ownership of the hospital through mortgage, sale, or transfer. *Id.* at 441. In the context of the overall transaction, the court found that the pharmacy agreement "functioned much like an overriding royalty payment," *id.* at 433, providing one element of the consideration for the debtor's group leasing its hospital to the lending group. Thus, to allow the debtor to assume the pharmacy contract after the debtor's group had defaulted in maintaining its ownership of the hospital would "thwart [the lending group's] bargain in agreeing to enter into the pharmacy agreement, all a part of the overall transaction to finance the building of the hospital through a loan secured by a collateral mortgage." *Id.* at 446.

Similarly, in *Kopel v. Campanile (In re Kopel),* 232 B.R. 57 (Bankr.E.D.N.Y.1999), the court enforced a cross-default provision linking agreements executed in conjunction with the sale of a veterinary practice. One agreement was an installment sale of the practice itself; another was a lease of the space in which the practice was conducted. The lease contained a provision that it would terminate if the tenant defaulted under the purchase agreement. The court found that this cross-default provision was inserted in the lease so that the selling veterinarian could resume his old practice if the buyer defaulted in the purchase of the practice, and thus protected "the very essence of the bargain." 232 B.R. at 67. "Had the cross-default provision been absent from the Lease, [the seller's] one essential condition to the sale-that he be entitled to step in quickly and operate the business in the event of any default-would have been thwarted." *Id.*

The critical feature of both *Liljeberg* and *Kopel* is that the agreements linked by a cross-default clause were economically interdependent: the consideration for one agreement supported the other. In each case, the court reflected this reality by observing that the non-debtor party would not have entered into one agreement without the other. *Liljeberg,* 304 F.3d at 445 ("[T]here is ample support for the conclusion that the lease and collateral mortgage of the hospital are interrelated with the pharmacy agreement and that there would have been no pharmacy agreement without the lease of the hospital or the loan secured by the collateral mortgage."); *Kopel,* 232 B.R. at 67 ("[Debtor] has not even argued that he could have entered into the Lease without also entering into the Non–Lease Agreements.").

In contrast to *Liljeberg* and *Kopel,* courts have repeatedly refused to enforce cross-default clauses that attempt to link parallel contracts with unrelated consideration. *In re Adelphia Business Solutions,*

*Inc.*, 322 B.R. 51, 62–63 (Bankr.S.D.N.Y. 2005) (separate leases for different space in the same building); *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 596 (S.D.N.Y.1992) (same); *In re Plitt Amusement Co. of Wash., Inc.*, 233 B.R. 837, 847 (Bankr.C.D.Cal.1999) (leases for motion picture theaters in different communities); *In re Sambo's Rests., Inc.*, 24 B.R. 755, 757 (Bankr.C.D.Cal.1982) (separate leases for restaurants); *In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 772, 778–81 (Bankr.W.D.Pa.1985) (separate insurance policies). In these cases, the courts found that allowing the debtors to assume individual contracts-notwithstanding cross-default provisions linking them to others that could be rejected-would not frustrate the economic interests underlying the contracts.

█ *The present case.* Although the City argues to the contrary, § 27.08 of the AUA is a cross-default clause. One of the most significant features of the AUA is the grant to United of exclusive use of terminal gates. That significance is underscored by the separate rent charged under the AUA for exclusive use space as opposed to other terminal space and by the provision that only exclusive use space can be subleased. The importance of exclusive use rights to an airline is further indicated by the considerations that led the FAA and Department of Transportation to urge that exclusive use rights not be granted-they provide a competitive advantage to the airline that enjoys them. Under § 27.08, United's "continued rights to use and occupy its Exclusive Use Premises" would terminate upon a default under its

special facilities bond payment agreements with no indication of what new rights would take their place. Although the City states that it is willing to offer United preferential use within certain limits, there is nothing in the AUA that requires this offer. The City could just as well insist on the common use arrangement that it employs for the international terminal at O'Hare. Thus, § 27.08 results in the loss of substantial rights under the AUA if United defaults under the bond payment agreement, operating as a classic cross-default clause.[12]

█ The cross-default rule is therefore applicable here, requiring a determination whether United's obligations under the bond payment agreements referenced by § 27.08 are economically linked to the AUA, so that the City would be deprived of the benefit of its bargain under the AUA if the bonds were not paid. If so, the cross-default provisions of § 27.08 would be enforceable in an assumption of the AUA under § 365 of the Bankruptcy Code.

The evidence establishes, however, that payment of the special facility bonds is unconnected to the City's interests in the AUA:

● The City has no liability to pay the bonds and no right to enforce United's obligation to do so.

● Failure by United to pay the bonds does not affect the City's ability to market other bonds.

● Although a reduction in United's flight volume at O'Hare would harm the City, a default by United in the payment of spe-

---

**12.** Indeed, § 27.08 can be seen as effectively terminating the AUA. To the extent that United's rights to use the airport were reduced, it is unlikely that United could be required to pay the same consideration to the City. The loss of exclusive use rights under § 27.08 would therefore likely result in a set of negotiations between the City and United over new terms for an airport use agreement, with none of the terms of the old AUA binding on the parties.

cial facility bonds has no necessary connection to the volume of its flights.

■ Indeed, the main argument the City makes to support enforcement of § 27.08 is not the economic impact of the section but rather its statement of intent:

> [I]t is the understanding and agreement of City and [United] that City would not have demised and let any Exclusive Use Premises to [United] hereunder if [United] had not heretofore undertaken the duties and obligations required to be performed and observed by [United] under the terms of such Special Facility Agreement.

(AUA, § 27.08(b).) The City advances this statement as proof that United's bond payments are essential to the AUA, citing the findings in *Liljeberg* and *Kopel* that the agreements sought to be assumed in those cases would not have been made but for the separate agreements referenced in the cross-default clauses under consideration. However, the findings in *Liljeberg* and *Kopel* were not based on a contractual statement of intent but rather on an analysis of the economic considerations actually involved in the contracts at issue. Here, where there are no economic considerations linking the AUA with United's obligations under the bond payment agreements, there is no basis for enforcement of a cross-default clause. A contractual statement of intent cannot by itself render a cross-default clause enforceable.

In the end, the AUA is a self-contained agreement, governing United's use of O'Hare and providing the full consideration for that use. To realize the full value of United's estate, § 365(a) of the Bankruptcy Code allows United to assume the AUA free from obligations imposed under the separate bond payment agreements, notwithstanding the cross-default provisions of § 27.08.

*Additional considerations.* Two other legal issues were addressed by the parties in connection with the enforceability of § 27.08 of the AUA. First, at the request of the court, the parties briefed whether § 27.08 operates as an ipso facto clause, unenforceable under § 365(b)(2) and (e)(1). See n. 10, above. By requiring payment of the special facility bonds-a non-priority unsecured debt-as a condition for maintaining United's exclusive use of space at O'Hare, § 27.08 would require action inconsistent with United's duty as a debtor in possession to make an equal distribution to all creditors of the same class. *See In re Kmart Corp.*, 359 F.3d 866, 873 (7th Cir.2004).

■ Concerns of this sort, however, are more properly addressed under the cross-default rule. Contractual obligations integral to an agreement that a debtor seeks to assume cannot be evaded merely because the debtor's failure to fulfill them was a result of the debtor's insolvency or bankruptcy filing. *See Yates Dev., Inc. v. Old Kings Interchange, Inc. (In re Yates Dev., Inc.)*, 256 F.3d 1285, 1289 (11th Cir. 2001) (holding that contractual penalties for a delay in exercising an option could be imposed even though the delay was due to the debtor's bankruptcy filing). Only provisions that directly invoke insolvency, bankruptcy filing, or appointment of a trustee or custodian are invalidated by § 365(b)(2) and (e)(1). *Id.* ("Section 365(e)(1) proscribes solely three types of clauses-those enumerated in subsections (A), (B), and (C)-and nothing more.")[13]

■ Second, United argued for the first time in post-trial briefing that the

---

**13.** The policy underlying § 365(b)(2) and (e)(1)—"to assist in the debtor's rehabilitation or liquidation" by allowing assumption of valuable executory contracts and unexpired leases despite ipso facto clauses (*see* H. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6304)—could certainly be frustrated if a

City's enforcement of § 27.08 would discriminate against United because of its bankruptcy, thus violating § 525(a) of the Bankruptcy Code.[14] The argument lacks merit. A governmental unit may enforce otherwise valid contractual default clauses without engaging in discrimination prohibited by § 525(a). *See In re Valentin*, 309 B.R. 715, 723 (Bankr.E.D.Pa.2004) (public housing authority could terminate the lease of a debtor for nonpayment consistent with nondiscrimination under § 525(a), as long as the authority considered the debtor for future public housing without regard to her bankruptcy filing). Certainly, United could not contend that the City would be engaged in discrimination prohibited by § 525(a) if it terminated United's exclusive occupancy rights on account of a failure to pay rent that the AUA itself required. If the obligation to pay special facility bonds were similarly an integral part of the AUA, it would similarly be enforceable, consistent with § 525(a).

The ipso facto and discrimination arguments thus provide no separate grounds for denying enforcement of § 27.08 of the AUA. The cross-default rule is sufficient for that result.

### Conclusion

For the reasons stated above, United is entitled to a judgment declaring that § 27.08 of the AUA may not be enforced to limit the rights received by United upon assumption of the AUA. Such a judgment will be entered separately from this decision.

debtor were required to perform under unrelated contracts as a condition for assumption. For example, a particular supplier of goods to the debtor might provide that its supply contract would terminate upon the debtor's breach of any similar agreement with other specified suppliers. Such a "pay all" requirement could effectively serve as a proxy for the debtor's insolvency, and, in bankruptcy, it would require the debtor to pay the pre-petition claims of the specified suppliers as a condition for assumption, a daunting undertaking given the rule of equality of distribution recognized and enforced in *Kmart*. However, the cross-default rule addresses this problem by preventing a debtor from being required to perform contracts substantially unrelated to the one sought to be assumed.

14. The City contends that the argument is untimely, but addresses the argument on the merits and makes no assertion that it would have introduced evidence bearing on the argument if it had been given earlier notice. *See Kuhn v. Civil Aeronautics Board*, 183 F.2d 839, 842 (D.C.Cir.1950) (requiring that a party complaining about inadequate notice show that he "was prejudiced by whatever delay or informality there may have been in the notice received").